HUBBARD v. WEARE.

HERVEY *et al.* v. THE SAME.

SAVERY v. THE SAME.

1. **False Representations**: GIST OF ACTION : SCIENTER : ACTIONS AT LAW AND IN EQUITY. The gist of liability for damages for false representations is that an intentional wrong has been committed to the injury of another ; the wrong being in representing as true that which is known to be false, as an inducement to the other to act to his injury. And in actions in equity as well as at law there can be no recovery on the ground of false and fraudulent representations, unless it be shown that the party making the representations knew them to be false, or that he made them under circumstances from which such knowledge will be inferred.

2. ———— : BY OFFICERS OF CORPORATION AS TO ITS CONDITION : PRESUMPTION. Before officers of a corporation make representations of its condition, as an inducement to others to take stock therein, it is their duty to use reasonable diligence to know that the representations are true; and they will be presumed to have used such diligence, and to possess the knowledge which its exercise would bring to them.

3. ———— : STATEMENTS MADE UPON ALLEGED PERSONAL KNOWLEDGE : ESTOPPEL. A person making a false representation as true to his personal knowledge will not be heard to say that he did not have knowledge that it was false.

4. ———— : BY OFFICER OF CORPORATION TO SELL STOCK : INTENTIONAL WRONG. Where an officer of a corporation, to induce others to take stock therein, makes material representations as to its financial condition which he knows to be false, yet with the confident belief that the corporation will soon be as represented, and that no loss will follow, commits an intentional wrong, for which he is liable.

5. **Corporations**: ASSETS : DIVIDENDS. The assets of a corporation consist of cash in hand and other property; and, if such assets exceed the liabilities, a dividend can lawfully be declared. Money paid out is not assets. If paid for property that is on hand, the property is assets; if expended in a way that has enhanced the value of the general assets, it is included in their valuation; if so expended as to have brought no property, or no enhancement of that on hand, then it is a loss, and should not be counted as assets.

6. ———— : ————: WHAT ARE AND WHAT ARE NOT: SPECIAL CASES. In considering what are and what are not to be considered as assets of a corporation, *held*—

(1) That, in estimating the assets at the end of a certain year, the profits of the preceding year should not be included as a separate item, where no such profits have been declared, and have not in any way been separated or withdrawn from the general assets.

(2) Money paid out for moving machinery and materials that went into the buildings should not be counted as a separate item, if the aggregate value of the buildings is given.

(3) Money expended in exhibiting machinery at fairs enters into the value of the general assets, and should not be counted as a separate item.

(4) Bills receivable should not be counted at their face without making such approximate deductions for loss as experience teaches to be inevitable.

(5) While interest on bills receivable should be counted as assets, interest on bills payable should be estimated in the liabilities.

(6) Money expended in the experimental construction of a new machine should not be counted as assets, but the actual value of the machine may be counted, if it has any; if not, the expenditure has been lost.

(7) Expenses should not be included as a separate item; if wisely made, they only enhance the value of the general assets.

7. **False Representations:** BY OFFICER OF CORPORATION TO SELL STOCK TO STOCKHOLDER. Where the president of a corporation knowingly makes to a stockholder, who is not familiar with the condition of the company, false representations in regard thereto, showing the company to be prosperous when it is not, and thereby induces such stockholder to take and pay for more stock, he is liable in damages for the wrong done.

8. ———— : BY PRESIDENT OF CORPORATION TO VICE-PRESIDENT AND DIRECTOR TO OBTAIN CREDIT. A stockholder in a corporation, who is also its vice-president and a director, will be presumed to know the condition of the company, especially where there has been a special investigation thereof, and its losses have been ascertained, and a committee has reported that dividends previously declared were fictitious; and where, under such circumstances, he indorses for the company, it will be presumed that he does so, not relying upon any false representations made to him by its president as to its prosperous condition, but with the hope of saving it from bankruptcy; and he cannot recover of the president for loss incurred thereby.

9. **The Same.** Where the vice-president and director in such case made a loan to the corporation after all its personal property had been mortgaged, of' which mortgage the evidence shows he had knowledge, he cannot recover the amount loaned, from the president of the company, on the ground that the latter induced him to make the loan by falsely representing that the company had a large amount of property on hand from which could be realized the money to pay the loan.

10. ————: BY PRESIDENT OF CORPORATION TO SELL STOCK : AGENCY. Where the president of a corporation makes false representations to the agent of other persons, knowing them to be false, with the intent to induce such persons, or persons generally to whom the representations may be communicated as true, to take stock in the company, and they, relying thereon, do so to their injury, he is liable the same as if he had made the representations to the parties in person.

*Appeal from Linn District Court.*—HON. JAMES D. GIFFEN, Judge.

FILED, FEBRUARY 13, 1890.

THE Williams Harvester Company was organized as a corporation under articles dated May 13, 1878, fixing the capital stock at eighteen thousand dollars in shares of one hundred dollars, each, with the defendant as president, which position he continued to hold during all the time the company carried on business. The capital stock was increased by amendment of the articles, dated August 25 and recorded October 23, 1879, to one hundred thousand dollars; again, by amendment filed for record January 3, 1882, to one hundred and fifty thousand dollars; and again, by amendment filed for record December 11, 1882, to two hundred and fifty thousand dollars. The plaintiff Hubbard subscribed and paid for stock in the company as follows: July 1, 1878, in cash, five hundred dollars; October 22, 1879, dividend, $187.50, cash, $12.50, making two hundred dollars; February 21, 1880, cash, five hundred dollars; November 29, 1880, cash, three thousand dollars; December 3, 1881, dividend, one hundred and twenty dollars, cash, eighty dollars, making two hundred dollars; November 7, 1881, cash, five thousand dollars;

December 13, 1881, cash, six hundred dollars; and December 13, 1881, for grandsons, two hundred dollars, being $307.50 in dividends, and $9,892.50 in cash. In addition to this, he loaned to the company on April 25, 1885, five hundred dollars, and again on June 15, 1885, five hundred dollars, taking the notes of the company therefor. He also, with others, indorsed notes of the company as follows: November 19, 1883, a note of five thousand dollars; March 31, 1884, note of five thousand dollars; and June 30, 1884, his acceptance for five thousand dollars,—which notes and acceptance are now outstanding. October 3, 1881, the plaintiffs Hervey, by N. M. Hubbard, subscribed and paid five thousand dollars for fifty shares of the capital stock of said company, for which a certificate was afterwards issued to said Herveys in their own name. On October, 1881, plaintiff Savery subscribed for one hundred shares of said stock; and, having thereafter paid ten thousand dollars in cash for the same, a certificate was issued to him therefor, dated November 7, 1881. Dividends were declared, for the year ending October 1, 1879, thirty-seven and one-half per cent. ; for 1880, ten per cent. ; and for 1881, sixteen and seventy-eight hundredths per cent. The plaintiffs each allege that they were induced to and did pay their money and incur the liabilities aforesaid by reason of certain representations made and caused to be made to them, respectively, by the defendant, which representations were false and fraudulent, and known to the defendant to be so at the time he made the same.

The representations set out by all the plaintiffs as being made by the defendant, and by which they were induced to subscribe and pay for stock, may be summed up as follows: (1) That said corporation was well organized and well conducted, upon a good business basis; (2) that it had made large gains and profits, and had actually earned the dividends declared; (3) that a greater dividend than ten per cent. might have been declared in 1880, but that it was thought best by defendant to hold a surplus; and (4) that there were sufficient

profits and earnings to have declared a dividend of ten per cent. in 1882, but that the money could be used to great advantage in the business. The plaintiffs Hervey and Savery each also allege that they were induced to subscribe and pay for stock as aforesaid by the further false and fraudulent representations of the defendant that the dividends theretofore declared had been paid in cash, and that by reason of the dividends declared and paid, and to be declared and paid, the stock was worth a premium of twenty-five per cent. The plaintiff Hubbard also alleges that he was induced to make said loan of one thousand dollars by a false representation of the defendant, that said corporation had a large amount of property, promissory notes and securities on hand, from which means could be realized to repay said loan; when, in fact, as defendant well knew, said corporation had no personal property but what had been transferred to the First National Bank of Cedar Rapids. The plaintiff Hubbard also alleges that, by reason of all said representations, he was induced to sign two notes of five thousand dollars each, and said acceptance. Each alleges that the company is insolvent. The plaintiffs, Hervey and Savery, each allege that, when they discovered the fraud practiced upon them by the defendant, they tendered back in writing to said company said stock, by reason of said fraud, and demanded a return of their money, with interest; that said company, through the defendant and other officers, acceded to the demand, received back said stock, and by the defendant as president, and D. G. Edgerly as secretary, executed to plaintiffs notes for the amount paid for said stock, with interest, together with mortgages on certain real estate of the company to secure the same; that they foreclosed their said mortgages, and bid off the property on execution sale for amounts less than the judgment; that they thereafter caused special execution to issue, which was returned, "No property found." The plaintiffs each ask to recover damages, and the plaintiff Hubbard further asks that,

as between the defendant and himself, the defendant may be decreed to pay said five-thousand-dollar notes and acceptance, and hold the plaintiff harmless therefrom. The plaintiffs Hervey and Savery allege that they are ready and willing to assign and turn over to the defendant, without recourse, the balance of said judgments, and they respectively demand an accounting of the money advanced and paid out by them for their stock, with interest, less the credit received by them on said judgments, after deducting costs, and that the balance be decreed to be due to them, respectively, from the defendant.

The defendant, in answer to each of the petitions, admits the organization of the company; that its articles were amended; that he was president thereof; that stock was subscribed and paid for at the times and in the amounts alleged; that dividends were declared as alleged; and that no dividend was declared or paid after December, 1881. As to the plaintiff Hubbard, he admits that he loaned one thousand dollars to and indorsed for the company as alleged, and that all the personal property of the company had been transferred to the First National Bank of Cedar Rapids before said loan. As to plaintiffs Hervey and Savery, he admits that they tendered back their stock, and received the notes and mortgages of the company as alleged, and that said mortgages were foreclosed and property sold as stated. Answering each plaintiff, he denies that any of said stock was taken or received by the plaintiffs at the instance or request of the defendant, or because of any statements or representations made by him; denies that he ever made any untrue, false or fraudulent representations whatever to the plaintiffs to induce them to take said stock, or to the plaintiff Hubbard to make said loan; and denies that said loan was made or stock subscribed because of any representations made by him. He denies that he made any concealment of the affairs of the company, or that indorsements by the plaintiff Hubbard and others were

secured through any false or fraudulent representations of defendant, or because of any concealment by him of the affairs of said company. He denies that the plaintiff Hervey ever subscribed for any of the capital stock of said company, or paid to the defendant or said company any amount therefor. He denies that the company is insolvent, or that the execution against said company was ever returned, "No property found." The defendant avers that said company was legally organized; that the dividends were declared by the directors of said corporation after a careful investigation of the property, credits and other assets and liabilities of the corporation; that the corporation had sufficient, good and available assets, over and above all its debts and liabilities, upon which to declare said dividends, and that the same were declared in good faith; that the transfer of all the personal property of the company to the First National Bank of Cedar Rapids was made before the loan of one thousand dollars by plaintiff Hubbard, and with the full knowledge, and upon the request and demand, of said Hubbard; that said Hubbard has ever taken a lively interest in and maintained a close acquaintance with the affairs of said company, and that all acts of said company were known to and approved by him; that he had as full means of knowledge at all times as defendant, as to the affairs of said corporation; that he was a director during the year 1879, and until May, 1880, and as such participated in and actively urged a vote for declaring the dividend of thirty-seven and one-half per cent. He avers that the only stock of said company ever owned or held by the plaintiffs Hervey was shares received and purchased by them from N. M. Hubbard, who subscribed for the same in his own name, and for himself, and paid for the same by his own money. He further avers that he believed, at the time said dividends were declared, that said company had actually earned all the dividends named, prior to the time the same were made, and avers that all the dividends were so earned; and

that at the time Hubbard received said Hervey stock he had full knowledge of the condition of said company.

The issues being in part the same, and the cases resting largely upon the same state of facts, they were submitted together in the district court, without being consolidated, under a stipulation that "the testimony offered and received in all of said cases shall apply to each one thereof, so far as it has reference to said causes, and that one transcript shall be made in all of said causes." The cases were brought and submitted as in equity, without objection, and, the district court having rendered judgment dismissing the plaintiffs' bills and for costs, plaintiffs appeal, and the causes are again submitted together upon the entire record.

*C. A. & W. G. Clark* and *F. F. Dawley*, for appellants.

*F. C. Hormel* and *C. J. Deacon*, for appellee.

GIVEN, J.—I. Counsel have discussed with evident care and ability, and with extended citations, certain questions of law to which we first give attention. To notice each of the points made and authorities cited would extend this opinion to an unwarranted length.

The most material points discussed are whether knowledge that the representations were false and an intent to defraud must be proven in these cases. Appellants' contention is that in cases solely cognizable in chancery, in cases of concurrent jurisdiction in law, actions against officers of corporations, and against persons making false representations as true to their personal knowledge, they not knowing whether the representation was true or false; *scienter* need not be proven. There are authorities that seem to sustain this view, while others hold the contrary. The seeming conflict arises from failing to discriminate between the rule as to proving *scienter* and the manner in which it may be proved, and in confounding cases for relief on

1. FALSE representations: gist of action: scienter: actions at law and in equity.

the grounds of intentional fraud with those for relief on the grounds of mistake. The gist of liability for false and fraudulent representations is that an intentional wrong has been committed to the injury of another, the wrong being in representing as true that which is known to be false, as an inducement to the other to act to his injury. *Holmes v. Clark*, 10 Iowa, 427; *McKown v. Furgason*, 47 Iowa, 636; *Avery v. Chapman*, 62 Iowa, 145; *Allison v. Jack*, 76 Iowa, 205. The basis for relief against mistake is not that a wrong was intended, but because a wrong will result from the mistake, if relief is not granted. To grant such relief is the peculiar province of courts of equity. *Wilcox v. University*, 32 Iowa, 374; *Curry v. Supervisors*, 61 Iowa, 74.

We regard it as well settled in this state that, though equity will relieve against false representations innocently made, the law will not afford relief on the grounds of false and fraudulent representations, unless it be shown that the party making the representations knew them to be false, or that he made them under circumstances from which such knowledge will be inferred. We do not discern why a different rule as to *scienter* should apply in actions against officers of corporations, or those making false respresentations as true of their own personal knowledge, from that applied in other cases of false and fraudulent representations. The fact of guilty knowledge may be established in such cases by quite different proofs from that which would apply in others, but the rule that knowledge must be proven is the same. Appellants contend that, as these cases were brought and are being prosecuted in equity, they are entitled to relief without proving the *scienter*. As the cases were brought and have thus far been prosecuted in equity without objection, and are now submitted upon the whole record for trial *de novo*, we will consider them as in equity, without, however, determining whether they were properly so brought or not. We are clearly of the opinion that, whether tried at law or in equity, the same rule as to *scienter* must apply; for, clearly, we cannot have two

different rules of law in the same state, for the same case, in the same court. If the relief asked, other than the recovery of damages, would make the cases of equitable cognizance, and triable in equity, still the question of damages must be measured by the same rules that would apply if tried at law.

II. The cases cited as forming exceptions to the general rule with reference to proving *scienter* relate to the manner of proving it, rather than to a variance of the rule. Officers of corporations, who hold out to individuals, or to the public, advantages which will accrue to persons who take shares in their corporation, and invite them to take shares on the faith of their representations, are bound to state everything with strict and scrupulous accuracy, and not only to abstain from stating as facts that which is not so, but to omit no fact within their knowledge, the existence of which might affect the advantages held out as inducements to take shares. Such officers will be presumed to have known that which it was their duty to know. Before making representations as to the condition of the company as inducements to take stock therein or extend credit thereto, it is their duty to use reasonable diligence to know that the representations are true, and they will be presumed to have used such diligence, and to possess the knowledge which its exercise would bring to them.

*2. ——: by officers of corporation as to its condition: presumption.*

Special emphasis should be given to these wholesome rules of the law, in view of the large investments that are being made in corporate enterprises, where the investors must necessarily trust largely to the honesty and fidelity of the officers of the corporation for the management of their investments. Outside investors can know but little of the affairs of the corporation, while its officers may and should know them fully. One who makes a false representation as being true to his personal knowledge, without knowing whether it is true or false, for the purpose of inducing another to act, and

*3. ——: statements made upon alleged personal knowledge: estoppel.*

upon which he does act to his injury, should certainly be held liable for the deceit; and yet it is argued that he is not liable because he did not know the representation to be false.   A person making a false representation as true to his personal knowledge will not be heard to say that he did not have knowledge as. to its truth or falsity.   Having assumed to have the knowledge, he should be taken at his word, and held to have known that the representation was false.   In representing that he had personal knowledge as to the truth of the representation, when in fact he did not, he makes a false representation in asserting that he had the knowledge. Our conclusion is that, in all cases for relief on the grounds of false and fraudulent representations, the burden is upon the party asking relief to show by direct evidence, or by inference from facts proven, that the party making the representation knew it to be false.

III.   These cases being actions for false and fraudulent representations, it must appear that the representations were made with intent to wrong or injure the parties to whom made. Such intention may be shown by direct evidence, or be inferred from the making of the false representations knowingly.   Such intention may exist, though the party making the representations confidently believed at the time that no injury would result therefrom.   For instance, an officer of a corporation, to induce others to take stock therein, makes material representations as to its financial condition, which he knows to be false, yet in the confident belief that the corporation will soon be as represented, and that no loss will follow; he surely commits an intentional wrong, notwithstanding his belief.   The wrong is in inducing others to take stock in a corporation that is not as he has represented it to be.   The parties taking stock under these circumstances are entitled to shares in a corporation such as he represented, but get shares in a company such as it was.

4. ——: by officer of corporation to sell stock : intentional wrong.

IV.   Some difference is expressed as to what are profits, and how they are to be arrived at.   This is fully

**5. CORPORA-TIONS: assets: dividends.** answered in *Miller v. Bradish*, 69 Iowa, 278, where it is said: "The assets, resources and funds of the corporation must consist of cash on hand and other property, and, if such assets exceed the liabilities, a dividend can be lawfully declared;" in other words, a profit exists. Money paid out is not on hand, and should not be reckoned as assets. If paid for property that is on hand, the property is assets. If expended in a way that has enhanced the value of the general assets, it is included in their valuation. If so expended as to have brought no property, or no enhancement of that on hand, then it is a loss, and should not be counted as assets.

V. Such being our conclusions as to the law, it remains for us to determine, from the facts in the cases: (1) Whether the defendant did make, or cause to be made, to the plaintiffs or either of them, as true, one or more of the representations alleged; (2) whether such representation was made to induce the plaintiff to whom made to act as it is alleged he did act; (3) whether the representation made was false; (4) whether the defendant knew the same to be false at the time of making it; and (5) whether the plaintiff relied upon the representation so made as true, and acted thereon, as alleged, to his injury.

VI. Before noticing the cases separately, we state the following as the most important and controlling of the many facts appearing in a somewhat voluminous record: Dyer Williams was the owner of a patent right for a certain kind of mower and reaper, together with a lot of patterns, moulds and machinery for manufacturing the same. In May, 1878, the Williams Harvester Company was incorporated for the manufacture and sale of these machines and others, with a capital stock of eighteen thousand dollars of which the defendant Weare took five thousand dollars, and the plaintiff Hubbard five hundred dollars, for which each paid in cash. The balance was taken by different persons, and paid for in cash, or property wanted by the company, at

reasonable values. The company continued in business up to 188—, when it was forced to suspend for want of funds, and because of its property being applied in paying or securing its indebtedness, of which a considerable amount remained unprovided for. An improved machine was invented in 1880, and to a limited extent placed upon the market in competition with this company's harvester, in 1882, and more generally in 1883 and thereafter. This was no doubt one of the causes of the decline in the company's business, but does not fully account for the losses reported September, 1882, for to that date the competition was limited. To meet this competition, the company set about inventing and manufacturing a self-binder of its own, which, however, was not so far perfected as to be put upon the market during the life of the corporation. Considerable sums were expended in constructing this new machine. At the time of the organization the company purchased a manufacturing establishment with the view of converting it into an establishment for the manufacturing of their machinery. They also purchased a new location, to which the old establishment was moved. Statements of assets and liabilities were made to September first of each year by the superintendent and bookkeeper to the board of directors, on which, and so far as appears without further investigation, the board declared dividends as already stated; all of which were payable in stock, except the dividend for 1881, which was payable in one and two years, with six per cent. interest. No dividend was declared for 1882, there being a loss for that year. June 16, 1883, a committee was appointed to revise the statements of the company's business up to and including 1881. Their report made July 24, 1883, shows a loss of $34,798.50 in 1881, instead of a profit of $13,856.35 upon which the dividend was declared. Their report was based upon valuations as they found them to be in 1883, and not as they were in 1881. During these years, and for many years preceding, the plaintiff Hubbard and defendant were upon intimate business and social relations. Each seemed to have had full confidence in

the business capacity and integrity of the other. They were both men of large business experience,—Hubbard as a lawyer of extensive practice, and Weare as a capitalist and banker. Weare was president and director of the Harvester company from its organization, and gave to the business of the company his personal supervision. Hubbard was a stockholder, and for a time one of the directors. He occasionally attended the meetings and visited the works, but did not exercise any direct supervision over the business, and did not at any time investigate the books of the company so as to know its condition financially. The plaintiffs, Herveys and Savery, were personal friends of Hubbard, but strangers to Weare. It was through Hubbard that Herveys took the stock, he subscribing for it for them; they making the payment and receiving the stock certificate in their own names. In doing so, they relied wholly upon what had been represented to them by Hubbard, as neither ever had any interview with Weare on the subject. Savery, acting upon representations made to him by Hubbard, sought and had an interview with Weare, after which he subscribed and paid for his stock. Savery had no knowledge of the company's affairs, except as gained through Hubbard and Weare; and Herveys had no knowledge concerning it, except as gained through Hubbard.

VII. Taking the cases in their order, we first consider that of the plaintiff Hubbard; and, first, as to the representations by which it is alleged he was induced to take and pay for stock. In view of the intimate relations between him and Weare, the relations of Weare to the company, his confidence in its ultimate success, and the evident desire to interest men of means, and in whom he had confidence, in the enterprise, leaves no doubt in our minds but that defendant did, from time to time, and for the purpose of inducing Hubbard to take stock, make the representations alleged. Indeed, it is scarcely denied that he did make those representations, and as being true; for he still contends that they were true, according to the facts as known at the time.

VIII.   Having found that the representations were made, we next inquire whether they, or either of them, were false.   The representation that the company was well organized does not affect the rights of the parties in these actions.   It is immaterial to their rights herein whether the amendments to the articles of incorporation were properly acknowledged or not.   The grounds upon which it is claimed that the corporation was not conducted upon a good business basis is because dividends were declared when the same had not been earned ; hence we do not consider this allegation separately.

Appellants contend that certain items were improperly included as assets, and others omitted from the statements of liabilities upon which the dividends were declared, and hence that it was not true that the corporation had made large gains and profits, and had actually earned the dividends declared, nor that a greater dividend than ten per cent. might have been declared in 1880.   The profits upon which dividends were declared were arrived at by deducting what was stated as the liabilities of the company from what was stated as its assets.   In the statement of assets to September 1, 1879, $498.32 was included as profit of season 1878.   No such profit had been declared, or in any way was separated or withdrawn from the general assets.   The profit, if any, remained as a part of the assets, and was included in the application thereof.   To state it as a separate item was to include it twice.

There was included in this statement of assets, "Moving account, $67.58 ;" and, in the statement for 1880, "Moving account, $1,608.41." It does not appear with certainty what these items represent.   Appellants contend that it is money paid out for removing the works from the old to the new location.   Appellee suggests that they represent the cost of bringing property the company had purchased and made a part of the plant from Chicago or elsewhere.   We see no other reasonable explanation than that it was

money paid out for moving machinery or materials, or both, that went into the buildings, and is, therefore, proper to be included in the assets; but not as a separate item, if the aggregate value of the buildings into which it entered is given. In 1879 the buildings were not valued as a whole, but in 1880 they were. The $67.58 was, therefore, properly included as a separate item, and the $1,608.41, in 1881, was not.

"Fair machines account, $144.97," was included as assets. Here, again, we are without definite explanation. Appellants contend that it was money paid out as expenses in exhibiting machines at the fairs, while appellee suggests that it represents machines on hand made for exhibition. Judging from the other items of the inventory and the amount, we conclude that it does not represent machinery on hand, but expenses of exhibiting machines. Whatever benefit comes to the corporation for such expenditure must be in the way of the enhancement of the value of its property and business, and not as in the case of the purchase of property which remained on hand. Entering, as it did, into the value of the general assets, it was covered by the estimate placed thereon, and should not have been included as a separate item.

"Outstandings, $22,821.39," was stated as assets in 1879. This is understood to include accounts mostly with agents and their customers for machines, some of which were in the hands of agents; others of which had been sold. No deduction was made for shrinkage or loss in collections. That a loss would occur is inevitable, and, though that loss could not be determined with exactness, experience would indicate about what it would be. Without such an approximation, the result would not show with any reasonable certainty the state of the company's affairs.

The statement for 1880 included as assets, "Accrued interest on bills receivable, $756.22." There is nothing included in liabilities for interest on the thirty-five thousand, five hundred dollars bills payable. It is argued that bills payable were largely to banks and for

merchandise; that bankers require interest in advance; that the company, being prosperous, paid at maturity, so that no interest was accruing against it. Common experience, and the subsequent history of the company, hardly warrant such a conclusion. We think that an approximation should have been made of the accrued interest for which the company was liable.

"Material and labor expense on self-binder, $1,708.78," was also included as assets in the statement of 1880. This represents what had been expended in the effort to perfect the new self-binder. Valuations in 1880 were to be made according to what was then known. The value of this machine, other than as old iron, depended entirely upon whether it could be made to work successfully. It was not possible at that time to determine what its real value was, and hence it was put in at what it had cost. Those having confidence in the success of the invention no doubt valued it very highly, while those not having such confidence might not give it any value. The object of valuing the assets was to see whether any profit had been actually earned up to that time that might be divided among the shareholders. It required future developments to determine whether the binder was of any value or not, and until it had an actual value it should not have been included as assets. The amount expended upon it was not assets, but a loss, that would come back or not, as the machine would or would not prove successful. Surely, as yet, there was nothing in the machine to divide; and in estimating the profits for the purpose of division, and as an inducement to persons to take stock, no such an uncertain element should have been included.

We have already considered the $1,608.40 moving account included in the estimate of 1880. There was also included, "Expenses, $391.99." We are unable to see how money that had been paid out as expenses can be considered as assets on hand for distribution, except as it has entered into the property on hand in the enhancement of its value. The property being estimated at its value, this item should not have been included.

"Bindery account, $2,919.59," is included in the statement of assets for 1881 as profits. Appellants claim that it was a total loss, and should have gone to the other side of the account, thus making a difference in the result of $5,839. The *status* of the new binder was about the same in 1881 that it was in 1880; that is, it was incomplete, and it had not yet been demonstrated whether it would be successful or not. While we are not prepared to say that this sum should have been included as a loss, we are satisfied, for the reasons already stated, that it should not have been included as profits or assets. No dividends were declared for 1882.

The results arrived at by the committee, in its review of the statements up to and including 1881, are not entitled to much consideration, as their estimates were based upon facts disclosed following the several dates at which dividends had been declared. In determining whether the dividends were earned, we must take the facts as they existed at the time they were declared. From what we have stated, it will be seen that our conclusions are that it was not true that the company had made large gains and profits, and had actually earned the dividends declared, nor that a greater dividend might have been declared in 1880 or 1882.

IX. Our next inquiry is whether the defendant knew the representations made to be false at the time he made them. As already stated, it was his duty, as president of the company, to use reasonable diligence to know that the representations he made were true, and he will be presumed to have used such diligence, and to have possessed the knowledge which its exercise would bring to him. Reasonable diligence did not require that he should have in person made the statement and calculations upon which the dividends in question were declared, but it did require that, before representing them as true, he should have so far reviewed them as to see that no improper items of considerable amount were included therein. On each occasion, when dividends

Same as number 4.

were declared, steps were taken for the further sale of stock. The character of the statements indicate a purpose to make large showings of profits,—a purpose that was apparent upon casual examination of the statements. In view of the defendant's business experience and close attention to the affairs of this company, we are satisfied that the improper character of the statements upon which dividends were declared, and the efforts to force favorable balances, did not escape his notice. We think it fairly appears, from all the facts proven, that defendant did know that sufficient profits had not been actually earned to justify either of the dividends declared. It is contended that no intent to injure plaintiff Hubbard can be inferred, because in his testimony he acquits the defendant of any bad faith. Such expressions do occur in the testimony, but, taking the whole testimony together, it is evident that the plaintiff did not intend to be understood as withdrawing his charge of intentional wrong. The defendant's investments and representations satisfy us that he confidently believed that the corporation would ultimately be so successful as to justify the investments being made in its stock. It does not appear that even Hubbard ever thought that Mr. Weare intended or expected that he would lose by the investments in the stock, yet the bad faith, the intention to wrong, was in representing that dividends had been earned, when the defendant knew they had not.

X. We next inquire whether the plaintiff Hubbard did rely upon the representations made, and whether he was induced thereby to subscribe and pay for all or any of the stock taken and paid for by him. It is not necessary that he should have been wholly influenced to take stock by the representations ; it is sufficient if the representations constituted a material part of the inducement. It is contended that Hubbard acted upon his own knowledge of the company's affairs; that he was not only a stockholder, but director and vice-president, and took an active interest in the business, and

7. FALSE representations: by officer of corporation to sell stock to stockholder.

was as well informed with respect thereto as the defendant. Hubbard's last subscription for stock for himself was in December, 1881, and he was not director nor vice-president until May, 1883. While there is some conflict in the testimony as to the attention he gave to the business of the company, we are satisfied that prior to 1883 it was but casual, and that he did not at any time make any investigation as to the earnings or financial condition of the company, but relied upon what was represented to him by the officers, and particularly by the defendant. It does not appear that prior to 1883 Hubbard did more than to occasionally attend the meetings and visit the factory. He had nothing whatever to do with the making of the statements upon which dividends were declared, nor with declaring the dividends. There is testimony tending to show that the statements were sent to all the stockholders, but Hubbard denies ever having examined them, if received by him. Mr. Weare was a man of large business experience, in whom Hubbard had full confidence. He was giving his personal supervision to the business of the company, while Hubbard was otherwise engaged. We fully concur in the finding of the district court, that Hubbard purchased the stock "relying upon the representations of the defendant, and believing them to be true, and without any investigation into the true condition of the company's affairs and financial condition." We think it fairly appears that Hubbard relied upon the representations of the defendant as to the earnings of the company, and was induced thereby to take and pay for the stock that he did, except as to the five hundred dollars taken and paid for July 1, 1878.

XI. The indorsements against which plaintiff Hubbard asks relief were made November 9, 1883, and March 31, and June 30, 1884. He claims that he was induced to make these indorsements by the same representations that induced him to pay for stock. These indorsements were not made until after he was elected director and vice-president, and after the

8. ——: by president of corporation to vice-president and director to obtain credit.

losses for the year ending September 1, 1882, were ascertained, which losses, the plaintiff says, were more than eleven thousand dollars; and not until after the report of the committee, June 24, 1883, showing, as plaintiff says, "that all of the dividends were fictitious." While it appears that Hubbard took but little more part in the business after his election, in 1883, than before, yet, in view of his official relation to the company, and the ascertainment of these large losses by committee and otherwise, we may fairly presume that he knew of the loss and report before making either of the indorsements, and, knowing it, no longer relied upon the defendant's representations as to profits. We think that he, with others, joined in the indorsements, hoping to save the company from bankruptcy, and themselves from further loss, and that he is therefore not entitled to the relief asked, as against these indorsements.

XII. Plaintiff Hubbard contends that he was induced to make the loan of one thousand dollars by a

9. The same.     representation of the defendant that the corporation had a large amount of property on hand, from which means could be realized to pay the loan, when in fact its property had been transferred to the First National Bank of Cedar Rapids. On July 17, 1884, a mortgage was executed to the bank on all the company's personal property. This mortgage was not filed for record until January 5, 1886. There is much conflict in the testimony as to whether the plaintiff Hubbard knew of this mortgage before making the loan. We have examined the testimony carefully, and are of the opinion that the weight of the evidence is in favor of the conclusion that the plaintiff knew of the transfer at the time the mortgage was executed, and did not, therefore, rely upon the representation alleged in making the loan. Our conclusion, upon the whole case, is that the plaintiff Hubbard is entitled to recover of the defendant Weare all amounts paid in cash for stock, except the five hundred dollars paid in July,

1878, with six per cent. interest from the time of payment; and that he is not entitled to any part of the relief asked as to the loan of one thousand dollars, or the indorsements made by him for the company.

XIII. In the case of Herveys, plaintiffs, the first contention to be noticed is whether the stock held by them was taken from the company by them, or by N. M. Hubbard. They claim that Hubbard subscribed for the stock for them, and that they paid for it, and received the certificate in their own names; while appellee claims that Hubbard subscribed and paid for the stock, and sold it to Herveys. It appears conclusively that Weare and others desired that the increase of stock authorized should be disposed of, and, as far as practicable, to friends of those already interested. Hubbard named to Weare the Herveys and Savery, as persons who would take stock, and he, under authority from Herveys, subscribed for the fifty shares, which they afterwards paid for, and received a certificate in their own names. This stock was carried on the books of the company in the name of Herveys. We have no doubt that these shares were taken for and were the property of Herveys from the beginning. They acted through Hubbard as their agent, and were induced to authorize him to take the stock for them solely by his representations as to the condition of the company. Hubbard testifies that he communicated to them just what Weare had represented to him, and that he was induced by Weare's representations to take the shares for Herveys. If Weare made false representations to Hubbard, knowing them to be false, with the intent to induce persons named, or persons generally to whom the representations might be communicated as true, to take stock, and they, relying thereon, did so to their injury, he is liable the same as if he had made the representations to the parties in person. If he made false representations to Hubbard, knowing them to be false, with intent to induce the taking of stock, and Hubbard, relying

*(margin note: 10. ——: by president of corporation to sell stock: agency.)*

thereon, took stock for Herveys as their agent, to their injury, Weare is liable, the same as if the representations had been made to Herveys in person. We have found that Weare did represent to Hubbard that there had been sufficient earnings to justify the dividends declared, two of which preceded this subscription; that said representation was false, and known to Weare to be so, and was made to induce the taking of stock. That Hubbard communicated this representation to Herveys is uncontradicted, and we have no doubt but that they were induced thereby to authorize Hubbard, as their agent, to take the stock for them, and he, as such agent, was induced to and did so take it. It follows, from these conclusions, that the plaintiffs Herveys are entitled to the relief demanded.

XIV. In the case of J. C. Savery, plaintiff, it appears that, although N. M. Hubbard had communicated to him the statements of defendant Weare, Savery did not act thereon, but sought and had an interview with Weare in person, before taking the one hundred shares of stock that he did take. Savery testifies that he "came to Cedar Rapids for the purpose of investigating the thing before subscribing." He testified unqualifiedly that defendant Weare told him generally about the business, and reported it to be a very profitable investment; that the dividends were paid out of the profits; "Did not say they had been paid in stock;" that they had not only paid the dividends, but had a surplus; and that the stock was worth $1.25 as an investment. Weare has no recollection of this interview, but does not doubt that it occurred, because he "was in a situation to be called upon by people inquiring about this or that institution in a pecuniary point of view." We do not understand him as admitting that he made the statements testified to by Savery, but the fact that dividends had been declared, and the fact that similar statements had been made to Hubbard, go far to corroborate the testimony of Savery. Appellee contends that he did not know

Hubbard v. Weare.

that Savery contemplated taking stock, and, therefore, his statements, whatever they were, were not intended to induce him to do so. It is evident he and Hubbard had talked of Savery taking stock before, and the character of Savery's inquiries must have indicated that purpose. Without enlarging upon the facts, we announce as our conclusion that the defendant, Weare, did make to the plaintiff Savery the representations alleged, as an inducement to subscribe for stock; that said representations were false, and known to the defendant to be false; and that the plaintiff Savery, relying thereon, was induced thereby to take and pay for one hundred shares of said stock, to his injury, and that he is entitled to the relief demanded. The judgment of the district court in each case is reversed, and the cases are remanded for further proceedings, and judgment in accordance with this opinion.

                                              REVERSED.