JOHN VOGTMAN, SR.,

*vs.*

MERCHANTS MORTGAGE AND CREDIT COMPANY, a corporation of the State of Delaware, HARRY ADES, FLORENCE ADES LEVINSON, SYLVIA ADES, CARL GERVER and C. J. LEVIN.

*New Castle, March 8, 1935.*

. *Harry Rubenstein*, for complainant.

*Christopher L. Ward, Jr.*, of the firm of Marvel, Morford, Ward & Logan, and *William H. Bennethum, 3rd*, for defendants.

THE CHANCELLOR: The charter of the corporation confers the sole voting rights upon the Class A common stock. The preferred stock is possessed with no voting powers. But the charter provides that in case the stipulated dividend on the preferred stock shall not have been paid for two semi-annual periods or the required sinking fund payments shall not have been made for two periods, the preferred stock shall have the sole voting privilege until payment of all accumulated dividends thereon and all payments into the sinking fund shall have been made.

·The complainant alleges that two arrearages existed in both the preferred dividend and the sinking fund payments when directors were elected by the Class A common

stockholders in 1933. The evidence, however, fails to support the allegation concerning the sinking fund arrearages. The only question which the evidence deals with is whether or not the preferred stock dividends had been paid for two periods prior to the meeting.

The' annual meeting for the election of directors was called under the by-laws for March 1, 1933. Notice of that meeting went to Class A common stockholders only. A dividend had been paid on the preferred stock on January 1, preceding. ' Apparently then the preferred stockholders were not entitled to vote.

When the meeting of Class A common stockholders convened on March 1, 1933, some controversy arose over the accuracy of the financial statement submitted by the treasurer as of December 31, 1932. As a result thereof, the chairman named a committee to go over the company's books. The meeting adjourned subject to call, without having elected directors.

It was reconvened on May 15, 1933. No quorum being present, the meeting adjourned subject to the call of the president.

The president issued a call for the reconvening of the meeting on June 26, 1933. A quorum does not appear to have responded. At the meeting discussions arose concerning the purchase of all the interests in the corporation held by Harry Ades, its president, and the controlling Class A common stockholder. The minutes disclose that "as an agreement was reached the meeting was postponed until such time as the terms of such arrangements could be carried out." Thereupon an adjournment was voted subject to the call of the president.

Thus far, the meetings were of the Class A common stockholders only. After the meeting of June 26, 1933, meetings of the preferred stockholders make their appearance. This was due I take it to the tentative arrangements made at the June meeting for buying the stock interests of Harry Ades.

A notice went out on June 30, 1933, to both the common and preferred stockholders of a special and extraordinary meeting to be held on July 10, 1933. The business to be transacted at the meeting was listed under five heads, all of which appear to be described as matters necessary to be acted upon in carrying out some kind of arrangement that had been made to purchase the Ades' holdings and thus eliminate him from the company. At the foot of the notice it was stated that immediately after the adjournment of the special and extraordinary meeting, the annual meeting of stockholders which was adjourned on June 26, 1933, subject to call would be reconvened.

Thus two stockholders' meetings were to be held on July 10, 1933—one of the common and preferred stockholders jointly and the other of the common stockholders adjourned over from June 26th. Separate minutes were kept of the two meetings. No quorum was present for the special meeting of the common and preferred stockholders. It was adjourned, according to the minutes in evidence, to meet again on July 17, 1933.

The minutes of the Class A common stockholders' meeting show the presence of a quorum and that the individual defendants were elected directors. It is this election which the bill challenges.

The election is challenged on the ground that the corporation had omitted to pay dividends on the preferred stock for two semi-annual periods and hence the Class A common stock had lost its right to vote. Had the vote been taken on March 1, 1933, when the original meeting of Class A common stockholders convened, there would have been no question about the right of that stock to vote; because at that time, even conceding the preferred dividend of January 1, 1933, to have been unlawfully declared and paid as is contended by the complainant, there still would not have been two defaults in the preferred dividend. But, if the preferred dividend of January 1, 1933, was unlawfully de-

clared and can therefore be counted as in default, as the complainant contends, by the time July 10, 1933, had arrived there were two defaults because the preferred dividend which was payable on July 1, 1933, was passed. The complainant, testing the right of the Class A common stock to vote as of July 10, 1933, when it actually voted rather than as of March 1, 1933, when it could have but did not vote, claims that the passing of the July 1st preferred dividend was a second period default. This claim rests on the contention that the prior dividend of January 1, 1933, was an illegal one under the statute.

Thus the complainant contends that on July 17, 1933, there was a failure for two periods to pay the preferred dividends. The defendants argue that even if the dividend of January 1, 1933, was an unlawful one, nevertheless as it was paid it cannot be said that under the charter the voting control had shifted to the preferred stock. They say that if the dividend was paid, as it was on January 1, 1933, the literal language of the charter contract was met, regardless of whether the dividend was lawfully declared. In making this contention the defendants look to the exact letter of the charter which shifts the voting control only when the preferred dividends for two periods "shall not have been paid." Such a literal interpretation of the charter cannot be accepted. It must be assumed that when dividends are mentioned in the charter in the present connection, the word is meant to refer to dividends allowed and permitted by the law. Any other construction would be highly unreasonable and fraught with great potentialities of damage to the capital of the corporation.

It may very well be doubted whether, in the case of a charter provision such as the one here involved, the preferred stockholders upon the arising of their right to vote could immediately, in advance of the regular annual meeting, assemble themselves together and elect directors in place of incumbent ones. Let that be as it may, I am of the opinion that if the right shifts to the preferred stock

between the original convening of the annual meeting and an adjourned session thereof when the voting takes place, the common stock cannot vote.

This being so, it is now in order to examine the question of whether the dividend of January 1, 1933, was a lawful one. The defendant corporation was organized to carry on a loan and investment business. Such a corporation may declare dividends either "out of its net assets in excess of its capital" or "in case there shall be no such excess, out of its net profits for the fiscal year then current and/or preceding fiscal year." *Section* 34, *General Corporation Law* (*Revised Code* 1915, § 1948, as amended by 36 *Del. Laws, c.* 135, § 16).

In the case of the defendant corporation, it is not pretended that the dividend of January 1, 1933, was declared out of profits of the current or preceding fiscal year. There were no such profits.

The dividend is sought to be justified by the defendants as having been paid out of net assets in excess of capital, that is to say, out of surplus. The complainant insists there was no surplus out of which the dividend could be paid. A vast amount of testimony has been taken and much time has been spent upon this question of the existence of a surplus sufficient to cover the dividend.

Was there a surplus? A point of pronounced divergence in view between the parties exists as to whether or not assets for dividend purposes may be counted at cost regardless of present worth. The defendants insist that they may. The complainant insists they they must be reconciled to present value either by appropriate write-downs or by the equivalent of an appropriate reserve liability. It may be conceded that an estimated increase in the market value of a fixed asset in the form of a parcel of real estate which houses the offices of a corporation cannot be treated as a profit until the same has been realized by sale. *Kingston, et al., v. Home Life Insurance Co.,* 11 *Del. Ch.* 258,

101 *A.* 898. But this is far from saying that assets consisting of loans and investments which constitute the business turn-over of such a corporation as the defendant, may not be regarded as having suffered a shrinkage below cost when it is sought to ascertain whether there is a surplus of assets over liabilities for purposes of a dividend. Worthless bills receivable and accounts are to be entirely eliminated in the process of ascertaining net assets available for a dividend. *American Steel & Wire Co. v. Eddy,* 138 *Mich.* 403, 101 *N. W.* 578. The Pennsylvania Supreme Court in *Loan Society of Phila. v. Eavenson,* 248 *Pa.* 407, 94 *A.* 121, appears to have been of like view with respect to worthless loans. If so, assets of that general type which are only partially bad, should suffer an appropriate reduction. It is a question of degree only. In *Hubbard v. Weare,* 79 *Iowa* 678, 44 *N. W.* 915, it was held that where dividends may be paid out of the excess of assets over liabilities, on accounts due from agents and customers a proper deduction should be made for shrinkage or loss in collection. If they are good accounts they should be credited at face value. *Quinn v. Quinn Mfg. Co.,* 201 *Mich.* 664, 167 *N. W.* 898. In deciding whether a dividend was rightfully made, the transaction must be viewed as of the time when it was declared. *Main v. Mills, Fed. Cas. No.* 8,974, 6 *Bliss.* 98.

That the assets for dividend purposes should be computed with allowance for depreciation in value, is not only held by the authorities herein cited, but is recognized by our statute; for *Section* 34 of the *General Corporation Law,* as amended, expressly provides that no dividend shall be declared out of profits for the current or preceding year if the capital "shall have been diminished by depreciation in the value of its property, or by losses, or otherwise, to an amount" less than the outstanding stock.

Looking at the balance sheet of the defendant corporation as of December 31, 1932, we find an asset of loans receivable of $86,580.09. This figure represents the full

amount invested by the company in such loans. The testimony shows that some of the loans were unsecured, others of them which the defendants describe as "slow" were far in arrears, and others of them were secured by liens on automobiles and by junior liens on real estate. Yet in the face of these facts the defendant corporation carried the loans receivable at cost. If this corporation could realize cost on December 31, 1932, out of loans of $86,580.09 made on the type of collateral it accepted and in part on no collateral at all, its management possessed a financial shrewdness which no other concern in like business I dare say could demonstrate. The complainant contends that something like $22,000.00 should be depreciated on the item of loans receivable. That would be about a twenty-seven per cent. write-off. That may or may not be too much. Certainly it seems to me a ten per cent. depreciation would be as generous a compliment to the integrity of those accounts as the most sanguine hopes could reasonably extend. An accountant, I venture to say, would consider the suggested ten per cent. depreciation as too little. A reduction of at least $8,650.00 should be made in the item of loans receivable.

There is an asset item of $42,315.03 described as loans to affiliated company. The affiliated company is a one hundred per cent. owned subsidiary of the defendant corporation, called Home Realty Company. It appears that when the defendant corporation acquired a piece of real estate in foreclosure of a lien it held thereon, it had the title placed in Home Realty Company and carried in its own asset column the amount the property had cost it as a loan to the subsidiary. The item above referred to represents therefore investments in real estate carried in the name of the wholly owned Home Realty Company. But only $36,195.00 of the item represents the actual cost of the investment in real estate. This is $6,120.03 less than the book asset of $42,315.03. The addition of $6,120.03 is explained as interest on the investment. But the interest was never paid by Home Realty Company. It is not even shown that Home

Realty Company is able to pay it. The contrary in fact appears. The fact of the matter is that $6,120.03 represents what the defendant company would have received on its investment in real estate if it could have made six per cent. on the amount invested. This is a capitalization of unproductivity. Dividends cannot be declared out of such a book-keeping operation.

The complainant introduced evidence from the lips of an expert on real estate values in the locality where the defendant company's real estate is located showing that the real estate held by the defendant instead of being worth the cost of $36,195.00 as carried in the balance sheet, is worth only $24,750.00. If this testimony be accepted the real estate item was over-valued by $11,445.00. I was very much impressed by the competency of the expert who made these estimates and by the character of his testimony.

I do not recall a single depreciation below cost of a single asset of this company which the directors made on December 31, 1932, notwithstanding values generally had on that date fallen considerably below what they were when the assets were acquired.

What is the result? Recapitulating, I conclude that loans receivable should be depreciated by at least $8,650.00, loans to affiliated company by at least $6,120.00, and real estate by $11,445.00. The total is $26,215.00. None of these items of assets which I have depreciated was carried as a permanent investment. The character of the business was to lend money. The real estate it acquired was incidental only to a liquidation of its loans.

The company had a paper surplus of $6,306.84 and what the balance sheet called a "surplus reserved" of $10,680.00. Its total surpluses were then $16,986.84. But as the assets were over-valued by $26,215.00, it is obvious that there were no net assets above capital out of which to declare the preferred dividend on December 31, 1932, of $4,508.00.

I conclude, therefore, that the dividend paid on January 1, 1933, is to be disregarded as a dividend paid within the meaning of the charter clause dealing with voting rights. As the July 1, 1933, dividend was passed, the Class A common stock had no right to elect directors on July 10, 1933.

It is contended, however, that the complainant is not entitled to be heard in objection to the alleged illegality of the votes cast by the common stock, because, it is claimed, he was present at the meeting and made no protest against the voting of that stock. In *Triplex Shoe Co., et al., v. Rice & Hutchins, et al.,* 17 *Del. Ch.* 356, 372, 152 *A.* 342, 72 *A. L. R.* 932, the Supreme Court of this State by way of dictum said that it might be true that if a stockholder was present at a meeting, consented to the voting by others of no par value common stock (alleged to be illegally outstanding) and himself voted such stock, he would not be permitted to question the stock's validity. That dictum, if accepted as the law, carries the doctrine of consent farther than the facts of the instant case would necessitate, because here the validity of a stock issue is not involved. The only question here is the less consequential one of voting rights of stock which is admitted to have been lawfully issued.

It is a general principle that the legality of an election will not be inquired into upon the ground that illegal votes were cast at the instance of stockholders who were present at the meeting and made no objection to the receipt of the questioned votes. *In re United Towns Bldg. & Loan Asso.,* 79 *N. J. Law,* 31, 74 A. 310, 311; *Rossing v. State Bank,* 181 *Iowa,* 1013, 165 *N. W.* 254; 5 *Fletcher, Cyclopedia of Corporations,* (*Perm. Ed.*) *par.* 2044, *p.* 155; 22 *Thompson on Corporations,* (3d *Ed.*) § 1034; 2 *Cook on Corporations,* (8th *Ed.*) § 620. This rule is based on the principle that the stockholder cannot be heard to complain of a wrong which but for his own neglect or acquiescence might by timely objection have been corrected. But as observed by

the court in *Wiltz v. Peters,* 4 *La. Ann.* 339, 341, "where the illegality rested upon facts, as to which the party subsequently complaining was ignorant at the time, and was without means of knowledge," the general rule is not applicable. To the same effect, it seems to me, is *In re United Towns Bldg. & Loan Asso., supra,* cited by the defendants, where it was pointed out by the court that the complaining petitioner was not alone present at the meeting when he made no objection, but also that he "could have ascertained by examination of the stock books that the stock was not entitled to be voted."

The general rule that the silence of a stockholder at a corporate meeting prevents his being heard later in objection to the receipt of improper votes, must in reason be accepted with the qualification that he either knew of the infirmity of the tendered votes or that by reasonable attention to the available means of information at hand he could have learned thereof.

In the instant case, the invalidity of the challenged votes rested upon the fact, if it was a fact, that the preferred dividend of January 1, 1933, was an illegal dividend, and that therefore, when the meeting was held, two dividends on the preferred stock as contemplated by the charter had not been paid. The stockholders had a right to assume that the directors had acted lawfully when the dividend was declared. The statement circulated by the directors showed on its face that the financial condition of the company warranted the dividend. It would be highly unreasonable to say that the stockholders should have made investigation on their own account of the propriety of the directors' action in declaring the dividend and of the accuracy of the statement exhibited to them. In this respect the case is much stronger than *Cahall, Rec'r., v. Lofland, et al.,* 12 *Del. Ch.* 299, 319, 114 *A.* 224, in which the Chancellor held that the stockholders were under no duty to examine the books containing the minutes and accounts of the corporation which were present at the meeting.

The complainant is then not foreclosed by reason of his failure to object at the meeting to the receipt of the votes of the common stock. That no objection was made in his behalf by his proxy is however denied. The denial presents a question of fact which, because of what has just been said, it is unnecessary to resolve by a finding.

The preferred stockholders undertook to elect directors on July 17, 1933, on which date it is claimed they adjourned to meet when the special and extraordinary meeting of July 10, 1933, failed for want of a quorum. No notice of a meeting of preferred stockholders for the purpose of electing directors was ever sent out. There were 1,127 preferred shares of that stock outstanding. It is true that 627 preferred shares, a quorum, were represented at the meeting of July 17th. But the other 500 shares were entitled to notice of the meeting and an opportunity to be present. The paragraph at the foot of the notice of June 20, 1933, did not advise the preferred stockholders that they would be called upon to elect directors. The reasonable intendment of that paragraph was that it was meant for the common stockholders. I decline therefore to decree the persons who were purported to have been elected by the preferred stockholders on July 17th as the directors of the corporation.

The bill prays that the court determine who are the directors and officers of the corporation. Inasmuch as the two meetings above referred to resulted in no election, it follows that the officers and directors who were in office by lawful election prior to the 1933 meetings continue to be officers and directors until their successors are duly elected and qualified. No annual meeting has been attempted to be held since 1933. One is now in order. Unless preferred dividend defaults have been cured, the preferred stockholders are the only ones entitled to vote.

Decree in accordance with the foregoing.