LOUIS E. MACHT,

*vs.*

MERCHANTS MORTGAGE AND CREDIT COMPANY, a corporation of the State of Delaware, HOME FINANCE COMPANY, a corporation of the State of Delaware, HARRY ADES, SIGMUND ADES, SYLVIA ADES NORINSKY and FANNIE ADES.

*New Castle, June* 30, 1937.

*Harry Rubenstein,* for complainant.

*William H. Bennethum,* of the firm of Marvel, Morford, Ward & Logan, for defendants.

THE CHANCELLOR: Merchants Mortgage and Credit Company, hereinafter referred to as Merchants, and Home Finance Company, hereinafter referred to as Home, are corporations of this State. The evidence shows them to be dominated and controlled by the defendant, Harry Ades. The defendants, Sigmund Ades and Sylvia Ades Norinsky, are the children of Harry Ades and the defendant Fannie Ades is his wife. The principal object sought by the bill is to enjoin Home and individual defendants from voting certain shares of the preferred stock of Merchants at a meeting of preferred stockholders of Merchants, which has been called, at which directors are to be chosen and at which, the complainant charges, a proposition might be submitted to ratify and confirm a sale of Merchants' business and assets to Home which has heretofore purported to have been made and consummated.

The bill alleges that voting power in Merchants became vested in its preferred stock. In another case, this court has so held. See *Vogtman v. Merchants Mortgage & Credit Co., et al.,* 20 *Del. Ch.* 364, 178 *A.* 99.

Litigation over the affairs of Merchants has been long pending in this court. Three suits have been instituted in connection therewith. They are first, the *Vogtman* suit, just referred to; a suit to rescind the sale of Merchants' business and assets to Home; and finally this suit.

Voting power in Merchants is lodged in the class A common stock which is overwhelmingly owned by Harry Ades. But upon the occurring of the defaults mentioned in the *Vogtman Case, supra,* voting power shifts to the preferred stock.

So long as the right to vote was vested in the class A common stock, Harry Ades was in a position of absolute control of the corporation. When his control was threatened by the assertion in the *Vogtman Case* that voting power had shifted to the preferred stock (a substantial majority of which was at that time held outside of his family), things began to happen. The agility with which Mr. Ades began to make his moves and the resourcefulness of his maneuvers in the very evident attempt to circumvent and outwit those who sought to assert the right of the preferred stock to assume control over the business and assets of Merchants are glaringly apparent.

His first move was to challenge the fact of default upon which it was claimed the voting right of the preferred stock had arisen. Evidently he had sought to forestall the arising of the right by the declaration of the illegal dividend referred to in the *Vogtman Case.* On that issue he finally lost as will appear from the opinion filed in the *Vogtman Case.*

While the *Vogtman Case* was pending and not very long after its institution he caused the directors of Merchants to resolve upon a sale of all the assets and business of Merchants to a corporation yet to be organized, viz., as it turned out, to the defendant, Home. Before the voting stockholders were asked to express their approval of the sale (such approval being necessary under the law) he caused a dividend to be declared on the preferred stock. The declaration of this dividend was not allowable under the law. See *Macht v. Merchants Mortgage and Credit Co., et al., ante p.* 70, 194 A. 23, decided this day. The purpose of the dividend declaration appears plainly to have been to

give color to the claim of the class A common stock which Ades owned, that voting power, if ever lost, had been restored to it, and that it, the class A common, was the stock "having voting power" (quoting the phrase of the statute) which need only then be consulted for assent to the sale. Having thus cleverly, as I suppose it was thought, restored to Ades' class A common stock the exclusive power to authorize the sale, Ades proceeded to have the class A common stock express its consent to the sale in writing and soon thereafter caused Merchants to sell and transfer all of its business and assets to Home. When the next dividend period for the preferred stock came along, Ades caused it to pass again in default. Dividends on the preferred stock of Merchants appear to have been declared or passed as the case might be according as the exigencies of Ades' desire for perpetuation of his control seemed to suggest as advisable.

It is in order now to make a brief comment about the Home Company which Ades caused to be formed to take over all of Merchants' business and assets. The sole assets which it acquired consisted of the former assets and business of Merchants together with shares of Merchants' stock received by it in exchange for its own stock as arranged by Ades. Without going into details, it is sufficient further to say that it is a corporation having two authorized issues of stock, one a preferred stock and the other a class A common stock. Both classes have equal voting rights. Merchants received as consideration for the sale, both class A common and preferred stock of Home. But Ades holds an amount of class A common stock of Home, received in exchange for his Merchants common stock, which is sufficient to give him a majority over both classes already issued as well as over all of both classes that are authorized to be issued.

If that situation should continue to be permanent, Ades, through Home, is firmly seated in control of the

former business and assets of Merchants, and can well be content to look with total indifference upon the question of whether the preferred stock of Merchants has now the voting control of that corporation.

When things had reached that stage, the *Vogtman Case* had not yet been brought to issue. The complainant in this suit, upon hearing of what had happened in the matter of the sale to Home, thereupon filed suit, this day decided, to set aside the sale.

Upon the filing of the bill to set aside the sale, Ades' position of security which had by then seemed so safe, was again threatened with danger.

Then began the occurrences which are the subject of the pending bill. Apparently it occurred to Ades that a good move to make in the new juncture would be to secure voting control over enough of Merchants preferred stock, whether by purchase or otherwise, to dominate a meeting of preferred stockholders. If such control could be secured, then Ades, if the preferred stock should be held to have the voting power, could vote to ratify and confirm the sale, or, if the worst should happen, viz., that recission and restoration should be decreed in the suit seeking that relief, Ades' control would still be preserved to him by virtue of his superior voting power in a meeting of Merchants' preferred stockholders.

Accordingly the series of transactions complained against in this suit was embarked upon by Ades. All of the transactions were directed to the common end of bringing the voting power over a majority of Merchants' preferred stock under Ades' control. Legal title to shares was acquired or voting rights otherwise obtained in divers ways. Merchants' former assets, now in possession of Home, were employed by Ades to achieve the result. The shares over which he thus secured control are to be classified as follows:

(1) Home holds 146 shares.

(2) Sigmund Ades, Harry Ades and Sylvia Ades Norinsky hold 205 shares as a "Protective Committee."

(3) Sigmund Ades holds 95 shares.

(4) Fannie Ades holds 75 shares.

The circumstances attending the acquisition of these several blocks will now be examined.

As to the 146 shares held by Home. Those shares were acquired by Home through exchange of its own preferred stock with sundry persons with whom Ades made the arrangements. In order to induce the holders of the Merchants stock to make the exchange Ades caused Home to pay out of the former Merchants' assets a total of $584.00 in cash. Some of the stockholders of Merchants who made the exchange received the amount of dividends accrued on their Merchants stock, some received that much plus a bonus, and some few possibly received nothing in the way of cash. The $584.00 thus paid out was afterwards reimbursed by Ades to Home, after affidavits were filed in the case pending in this court disclosing the facts. This circumstance emphasizes the real character of the exchanges as being in the interest of Ades individually and as a part of his general purpose to retain control over the assets whether they remained in possession of Home or were decreed to be returned to Merchants. The transaction is a plain one of a scheme by the person in control of a corporation to use his official power and to employ its assets in the interest of himself individually in order that his continued dominance as the corporation's ruler might be assured. For the time being, at least. Home should not be permitted to vote the 146 shares which it acquired in the manner above described.

As to the 224 shares which Sigmund Ades, Harry Ades and Sylvia Ades Norinsky hold as a "Protective Committee," my conclusion is that they should not be permitted to

vote. The deposit of these shares with the committee by the various holders was secured by paying out money to the depositing stockholders as an inducement to them to do so. The money was drawn from Home out of the assets formerly belonging to Merchants. It was I believe subsequently repaid to Home by Sigmund Ades, acting as the agent of his father, Harry Ades. In so far as the voting power of these shares is concerned, I think there can be no doubt that it was purchased. To allow voting rights that are bought to be exercised is against public policy, and would be in fraud of the other stockholders. *Dieckman v. Robyn,* 162 *Mo. App.* 67, 141 *S. W.* 717; *Brady v. Bean,* 221 *Ill. App.* 279; *Smith v. San Francisco, etc., Co.* 115 *Cal.* 584, 47 *P.* 582, 35 *L. R. A.* 309, 56 *Am. St. Rep.* 119.

Finally we come to the 95 shares held by Sigmund Ades and the 75 shares held by Fannie Ades, the son and wife respectively of Harry Ades. As the shares held by Fannie Ades were derived from her son Sigmund from a block of 170 shares which he acquired in the manner about to be set forth, it will be convenient to think of the two blocks as being one, viz., a block of 170 shares acquired by Sigmund.

Sigmund acquired the shares by means of a loan from Home, made to him out of the assets formerly possessed by Merchants. Sigmund acted solely as the agent and nominee of his father, Harry Ades, both in borrowing the money and in buying the stock. Harry Ades admits in substance that he was hidden behind the name of Sigmund. Sigmund borrowed a total of $8,477.00 from Home. Of this sum he paid $7,216.00 for the 170 shares, and $1,261.00 to compensate the sellers for dividends in arrears. Home laid out the money in small amounts from time to time during the months of April and May. No account appeared in the books of Home showing that these expenditures were repayable as a debt due from Sigmund until about six months later. Thus for a period of from six to eight months Home had loaned to Sigmund over eight thousand dollars with no

record to show the transaction. The loan as before indicated was to Harry Ades. Eventually it was paid down to $2,000.00 for which Home holds as security a mortgage on a property which, as I conclude from the evidence, is not worth over $1,200.00.

The details of the items entering into Sigmund Ades' account with Home will not be discussed. The conclusion I draw from the evidence is that Harry Ades, using Sigmund as his agent, made use of the resources of Home as freely as if they were his own for the purpose of financing the peculiarly personal project of his own to secure enough of Merchants' stock to enable him to control a meeting of its stockholders. The use of Home assets for that purpose was especially inequitable when it is remembered that those assets were all derived from Merchants and the proposal was being vigorously pressed that Home should be compelled to restore those very assets to Merchants. It was using Merchants alleged assets (in possession of Home) for the purpose of making it impossible for Merchants to secure their restoration.

I am of the opinion that when the questions are—who shall choose the directors of Merchants and shall the sale by Merchants to Home be rescinded and restoration to the *status quo ante* be restored—it would be inequitable to permit any of the shares to vote which are classified as above. What must be the final and permanent disposition of the shares and their voting rights will depend on considerations not now before the court for determination.

Looking at all the activities of Ades in the various connections hereinabove mentioned, the case appears to be one where a clearly identifiable thread of inequitable purpose runs through the fabric of Ades' interwoven acts—the purpose being one on the part of him as the controlling officer to use his power and the corporate assets to perpetuate his control. From the viewpoint of Merchants,

which is the only viewpoint which the instant case admits of, such is the case.

The injunction against voting at a meeting of preferred stockholders of Merchants will issue as prayed.