tain other errors were made in dates which, of course, will not be repeated upon a retrial.

III.   We are also of opinion that the trial court was in error in instructing that plaintiff could not be discharged under the written provision of the contract until thirty days 8. NOTICE OF     after the expiration of six months.   The no-
DISCHARGE.       tice might have been given before the expiration of the six months' period, to become effective at that time.   *McLain v. Calkins,* 77 Iowa, 468; *Drain v. Jacks,* 77 Iowa, 629.

IV.   The instructions quoted were also wrong in submitting the question to the jury as to whether or not plaintiff's services were in fact unsatisfactory.   A jury may have 4. DISCHARGE OF     inferred from this that it was to determine
SERVANT:     the character of the service as to being satis-
submission
of issues.     factory or otherwise.   If defendant was in good faith dissatisfied, that was sufficient although its dissatisfaction may have been unreasonable.   *Inman Mfg. Co. v. Am. Cereal Co.,* 124 Iowa, 737, and cases cited.   See also, *Allen v. Mutual Co.,* 101 Ala. 574 (14 South. 362).

V.   The remittitur was evidently for the last five months covered by the contract, but that does not cure the errors above referred to.

We need not consider the other points relied upon as they are either immaterial or are not likely to arise if the case is again tried.   But for the errors already pointed out, the judgment must be, and it is, *reversed.*

S. N. MAINE, Appellant, v. MIDLAND INVESTMENT COMPANY, et al, Appellees.

**Corporations:** SALE OF STOCK: RESCISSION.   One who is induced to
1     purchase corporate stock on the representation that the corporation was fully and legally organized when in fact no notice of incorporation was ever published as required by statute,

may have a rescission and cancellation of the stock and may recover of the corporation the sum paid therefor, although he made no effort to verify the statement; and whether .the representations were knowingly made or otherwise is immaterial.

**Rescission:** TENDER. A tender of corporate stock prior to commencement of action to rescind a sale thereof on the ground of. fraud is not necessary, but an offer in the petition to restore the same is sufficient.

**False representations:** LIABILITY OF AGENT. An agent of a corporation who represents to a purchaser of stock as an inducement to buy, that the organization is fully completed, having however no actual knowledge of that fact, is not personally liable to the purchaser in damages.

**Same:** EVIDENCE. An agent and officer of a corporation who knowingly makes false representations as to the condition of the company's business as an inducement to the purchase of its stock, which are relied upon, is personally liable for the damage suffered by the purchaser. In the instant case the evidence fails to show that the purchaser was deceived.

*Appeal from Polk District Court.*— HON. HUGH BRENNAN, Judge.

SATURDAY, NOVEMBER 17, 1906.

ACTION in equity by plaintiff, a stockholder, for recission and to wind up the affairs of the defendant Midland Investment Company, a corporation. , The remaining stockholders, J. A. Dyer, J. H. Campbell, E. K. Maine, and J. B. Lucas, are named as defendants. Lucas did not appear, but it does not seem that there was any demand for, or entry of, default as against him. Each of the other defendants appeared and answered. There was also a petition of intervention by the People's Fraternal Reserve, and this was answered by the plaintiff alone. The facts are sufficiently stated in the opinion. From a decree in favor of the defendants and intervener, the plaintiff appeals.— *Modified* and *affirmed*.

*Edmund H. McVey,* for appellant.

*John Newburn* and *J. A. Dyer,* for appellees Midland Company and Dyer.    *Dunshee & Dorn,* for appellees Campbell and the People's Reserve.    E. K. Maine, *pro se.*

BISHOP, J.— The Midland Investment Company was organized in Des Moines on August 6, 1902. The declared purpose of the corporation was to buy and sell personal and real property, and the capital stock was fixed at $10,000, to be issued in shares of $100 each. J. M. Brenton was named as president, L. A. Brenton, vice president, J. A. Dyer, secretary, and J. B. Lucas, treasurer; and these, with J. H. Campbell, were named as the board of directors. The articles were signed by each of such persons. It is admitted that publication of the notice of the formation of the corporation was never made. On the date of organization, fifteen shares of stock were issued. Five of these were issued to J. M. Brenton, five to L. A. Brenton, and five to J. A. Dyer. The certificates of shares issued to the Brentons bore upon their face the legend that they had been fully paid up in cash. J. M. Brenton in fact paid in no cash, and it does not appear what, if any, consideration for the stock moved from him. L. A. Brenton paid in $500 in cash. Dyer paid in no cash; it appears, however, that the stock issued to him was in consideration of services rendered — presumably as a lawyer in perfecting the organization of the company — and this fact was indorsed on the face of the certificate of shares. It seems that the plan of business adopted was to reach people of moderate means and to enter into contracts with them by the terms of which each of such contract holders should pay into the company treasury the sum of $1.50 per month, of which $1 would go into a home or trust fund, and fifty cents into an expense fund. The home fund was to be used in buying properties for the contract holders as fast as a sufficient amount was accumulated. The expense fund was to be used by the company in extending its business

and paying expenses of operation including salaries. The books of the company show that no business, tangible in character, was done during the month of August. During the months of September to February, inclusive, there was paid into the treasury by contract holders the aggregate sum of $569 to the home fund, and $284.50 to the expense fund. It is made to appear that, on September 10, 1902, the Brentons withdrew from the corporation, and their respective shares of stock were on that day assigned to the defendant Dyer. The precise consideration for the assignment does not appear. Now, the ledger of the company reveals the further facts that J. M. Brenton was paid out of the funds of the company by way of salary as president, the sum of $200, being $50 per month for four months, July to October inclusive; L. A. Brenton was paid by way of salary as bookkeeper $249.99, being $83.33 per month for three months, July to September inclusive. As a witness Dyer says that by oral agreement he was to have a salary of $150 per month, and the ledger shows that he drew from the treasury of the company in August the sum of $104.40, in September, $100, and in October, $50. Some time during the period between September 1st, and March 1st following, there was paid to Ophelia Newcomb, the holder of the contract first entered into, the sum of $150. It thus appears that up to March 1, 1903, there was paid out in salaries alone the sum of $704.39; being the entire amount, less $80.11, of cash paid in on stock, and by contract holders to the expense fund. So too, on the date last mentioned not only had the balance of the expense fund not exhausted in paying salaries been paid out, but the sum of $419 that should have been in the trust fund was likewise gone. Of this the only explanation given is the general one by Dyer that the money had been expended in meeting the expenses of the company. It thus appears that the treasurer stood holding an empty purse. On February 26, 1903, Dyer surrendered the stock originally issued to him, and

the shares held by him under assignment, and there was issued to him in lieu thereof a certificate of thirteen shares, and, by his direction, one share each to Campbell and Lucas. On March 1, 1903, the plaintiff took out fifteen shares of stock in the company, paying in therefor the sum of $1,500 in cash, and this sum was deposited in the bank to the credit of the company. The plaintiff was then elected president of the company, and his son, the defendant E. K. Maine, treasurer. As the stock to plaintiff was issued, one share was taken in his own name, and, by his direction, the remaining fourteen shares were issued in the name of his son, the defendant E. K. Maine. The business was then continued until about May 1, 1903, when the books and papers of the company were removed by E. K. Maine to another office. In the meantime there had been paid in by contract holders to the home fund $122.50, and to the expense fund $61.25. And these sums together with $815.15 of the money deposited in the bank had been paid out — $171.41 additional to the contract holder, Ophelia Newcomb, and the remainder in expenses of the business, including salaries to E. K. Maine and Dyer.

The foregoing statement, somewhat lengthy in its details, has seemed necessary to an understanding of the situation at the beginning of this action. In his petition plaintiff claims to be the sole owner of the interest represented by the fifteen shares of stock issued to him and his son, and this the son by answer admits. He alleges that he purchased said shares of stock on the solicitation of the defendants Dyer, Campbell, and Lucas; that said defendants falsely represented to him that the company was regularly and duly incorporated as a *de jure* corporation; whereas it had not been legally incorporated in that no notice by publication of the incorporation thereof was ever given as required by law. And from this it is said that the sale of stock to plaintiff was *ultra vires*, illegal, and void. It is further alleged that the condition of the company and its affairs —

especially as to the trust fund in its hands — was grossly misrepresented, whereby he was deceived and induced to part with his money. The petition then alleges the insolvency of the company, and it is said that the moneys paid in by contract holders constitutes a legal claim against the company, and that unless he shall be granted the relief prayed the balance remaining in the bank, being a part of the identical money paid in by him for stock, will be used for the payment of such claims. A tender of the stock in return and demand for the repayment of his money is alleged, and further tender is proffered by the petition. The prayer is that the stock held by plaintiff in his own name and that held in trust for him by E. K. Maine be rescinded and canceled; that the money remaining in bank be restored to him; that he have judgment against the defendant corporation, and the individual defendants Dyer, Campbell, and Lucas, for the difference between the sum of money refunded and the sum of $1,500 paid in by him, and for general equitable relief.

The defendant Maine admitted by answer all the allegations of the petition. As to the defect in the organization of the corporation, the other defendants who appeared made admission thereof but pleaded matter in estoppel, and they denied all fraud and misrepresentation, and denied the tender pleaded. The affirmative relief asked by them is that the affairs of the company be wound up, and that the receiver be ordered to pay out the funds in his hands to the stockholders *pro rata* in proportion to their holdings. On application of plaintiff a receiver was appointed, and he possessed himself of the moneys in the bank. It seems to be conceded that the company had no interest in any other property. Under the direction of the court the receiver gave notice to all persons having claims to present the same, and down to the time of the trial which was long after the expiration of the time fixed by the court in its order none were filed, except the claim of the People's Reserve — a

judgment based on a claim for rent.   The decree found for the defendants on the estoppel and fraud issues.   It was adjudged, however, that the corporation should be dissolved, and the receiver was ordered that, after paying the expense of his receivership, he pay first the claim of the People's Reserve; that he then pay the balance remaining to the shareholders proportionately to their holdings.   With the situation now fully before us, we may proceed to inquire what ought to be said and done in view thereof.

I. First we may dispose of the intervention feature, and this may be done by saying that the claim was a proper one to be allowed and it was sufficiently proven.   Indeed, in respect of this counsel for appellant makes no serious question.

II. We think plaintiff was entitled to a decree as for a rescission on the ground of the invalidity inhering in the corporate character of the defendant company.   Among other essentials requisite to the formation of a corporation is the publication of a notice giving certain information in respect thereto. Code, section 1613.   And that acts of the corporation may be valid such notice must be published within three months after the articles are filed with the Secretary of State and his certificate issued.   Code, section 1614.   One of the consequences of a failure to comply with the statute in respect of corporate organization is that the stockholders become individually liable for all corporate debts.   Code, section 1616.   Now, that it was represented by Dyer, who was secretary of the company, and, for that matter, the only person holding stock therein at the time, that the corporation was fully and legally organized is testified to by plaintiff, and this is not denied in evidence.   And plaintiff declares that he relied upon such representation.   This he had the right to do.   He was not bound to go the the records, or other sources of information, to verify the truth of the representation.   10 Cyc. 424, and cases cited in notes.   The

1. CORPORATIONS:
sale of stock:
rescission.

effect of the situation, therefore, was to work a legal fraud
on plaintiff.   Instead of becoming a stockholder in a law--
ful corporation, possessed of all the rights and immunities
incident to such, he simply became a member of what may
be termed a voluntary association, included in the perils of
which, as we have seen, was personal liability.   *Eisfeld
v. Kenworth,* 50 Iowa, 389; *Clegg v. Grange Co.,* 61
Iowa, 121; *Gent v. Insurance Co.,* 107 Ill. 652;
*Hurt v. Salisbury,* 55 Mo. 310.   And the case being in
equity, it can make no difference in this immediate connec-
tion whether the representation as made was wittingly or
unwittingly false and untrue.   In such cases scienter is not
of importance.   It is enough if the representation was false,
and operated to deceive.   *Mohler v. Carder,* 73 Iowa, 582;
*Hunter v. League Co.,* 96 Iowa, 573.   That fraud consisting
in misrepresentation such as is here complained of will
give rise to a right of action for rescission is settled by the
great weight of authority.   The reader will find the cases
collected in the notes to 10 Cyc. 421.

The matter of estoppel pleaded was that, after the
discovery of the fact of corporate defect, plaintiff and his
son continued to act as officers of the corporation and in the
transaction of its business.   The trouble with this matter
of contention lies in the proof.   The facts as disclosed by
the record are that no corporation business was done after
the discovery.   It is true that there was a meeting of the
stockholders held upon call of E. K. Maine, but nothing
was done except to talk over the situation of the company's
affairs.

A tender of the stock prior to the commencement of
the action was not necessary.   Where the action is in equity,
2. Rescission: it is sufficient if an offer is made in the pe-
tender.        tition to restore the *statu quo.*   *McCorkell
v. Karhoff,* 90 Iowa, 545.

III. We have as the remaining inquiry whether or
not plaintiff is entitled to judgment as against the in-

dividual defendants, or any of them, for an amount equal
to the difference between the sum of $1,500
paid by him for the stock and the available
sum in the hands of the receiver?   We con-
clude that he is not.   The representation as to the character
of the corporate organization was made by Dyer alone.
The representation was made in connection with the sale of
the company stock to plaintiff and as an inducement there-
unto.   It must be considered, therefore, that in such behalf
Dyer was acting solely as an agent of the company.   It
appears affirmatively that at the time he had no personal
knowledge of the defect in the corporate organization.   This
being true he could not have acted with *mala fides*.   Under
such circumstances an agent who professes to act only for
a disclosed principal is not personally liable although it
shall be made to appear that his representations were in
fact untrue.   *Riley v. Bell,* 120 Iowa, 618; *Seery v. Socks,*
29 Ill. 313; 10 Cyc. 429, and notes.

3. FALSE REPRE-
SENTATIONS:
liability of
agent.

The representations complained of respecting the con-
dition of affairs of the company were also made by Dyer
alone.   Without doubt he was perfectly familiar with the
condition as it existed, and, if shown that
false statements in respect thereof and ma-
terial in character were made by him, and relied upon by
plaintiff, there could be no good reason for denying per-
sonal liability on his part.   *Hubbard v. Weare,* 79 Iowa,
678; Riley v. Bell, *supra.*   Now, the complaint is of a
representation that the company was solvent and doing a
paying business.   A representation such in character would
be material.   But Dyer strenuously denies having made any
such representation, and we think the weight of the evidence
is with him.   If a contrary conclusion was warranted, how-
ever, the evidence makes it conclusive that plaintiff was not
deceived in any complainable sense.   Both plaintiff and E.
K. Maine knew when the stock was issued to them that the
company had neither money in the hands of its treasurer,

4. SAME:
evidence.

or property in any other form. If, then, Dyer represented that the Brenton stock had been paid in full, what mattered it? The empty treasury proved conclusively that the money was gone. If represented that the company was doing a paying business, the open books spread before plaintiff and his son — the former a man of business experience, and the latter a young lawyer — demonstrated to the contrary. And the volume of business which had been done would not indicate that many ledger pages were necessary to be examined. That the home or trust fund had been drawn out and used for other purposes was well known to both plaintiff and his son. And they went ahead, according to their own version, on the promise of Dyer to raise the money from his own resources, and replace the fund in the treasury. It is the testimony of plaintiff that it was the failure of Dyer to do this that led to the final break up in May, 1903. Following this the defect in organization was discovered, and this suit was begun.

From the foregoing consideration it follows that a decree should have been entered directing payment of intervener's claim, and, as there were no other creditors to be considered, directing that the balance in the treasury after paying the receivership expenses be paid over to plaintiff upon the return by him of the fifteen shares of stock; also a deficiency judgment against the company. To the extent thus indicated, the decree appealed from is modified; otherwise it is affirmed. A decree in harmony with our conclusion is ordered.— *Modified* and *affirmed.*