BESSIE FARNSWORTH, Appellant, v. THE MUSCATINE PRODUCE AND PURE ICE COMPANY, Appellee.

Fraud: SALE OF CORPORATE STOCK: EVIDENCE. In this action to rescind
1   the sale of corporate stock on the ground of false representations by the officers of the company as to its financial condition, the evidence is reviewed and held to show that the sale was induced by the false statements, which were relied upon.

Same: FALSE STATEMENTS: KNOWLEDGEMENT OF FALSITY: RELIEF. Equitable relief may be granted because of the positive misstatement of facts, relied upon by the injured party, even though the party making the statements did not at the time know of their falsity.

Same: CORPORATIONS: FALSE STATEMENTS BY OFFICERS. The officers of corporations who represent to the public the advantages which will accrue to persons who purchase stock in their corporation, and invite them to take stock on the faith of their representations, are bound to state the facts with strict accuracy.

Same: RESCISSION: RELIEF. Where one seeking to rescind the purchase of corporate stock, on the ground of false representations inducing its purchase, was not made a party to subsequent receivership proceedings, and the receiver was not a party to his action to rescind, he was not entitled to have his claim for the purchase price of the stock established as a preferred claim against the corporation; especially where that question was not argued.

---

*Appeal from Muscatine District Court.*—HON. L. J. HORAN, Judge.

TUESDAY, JUNE 3, 1913.

ACTION in equity to rescind the sale of stock in defendant corporation. There was a decree for defendant. Plaintiff appeals.—*Reversed.*

*Wade, Dutcher & Davis* and *D. V. Jackson,* for appellant.

*E. M. Warner,* for appellee.

PRESTON, J.—The defendant corporation was organized about November, 1909, with $50,000 paid-up capital, and proceeded to build its plant. It did some business in a small way prior to July 4, 1910, but had its opening on that date. About June 26, 1910, plaintiff called to see what defendant was paying for milk and cream. She and her husband were

living on a farm and had no experience in investments in cor-
poration stocks. About July 13, 1910, some of the promoters
or incorporators, being dissatisfied with the condition of the
business, had a special report or statement made, from which
it appeared that the company had exhausted the $50,000
received from the sale of its capital stock, and was indebted
in the sum of $30,000 for borrowed money at the bank, on
which the officers were indorsers; later, when unreported
checks and bills came in, it was discovered that the indebted-
ness was still more. One of the officers testifies that they
needed money to pay their debts, and on July 20, 1910, the
directors authorized the issuance of $25,000 more stock for
that purpose, and to protect themselves as indorsers of the
company's paper. No part of this issue was taken by any
one not previously interested in the company, except the ten
shares sold to plaintiff and her husband. Substantially all
this issue of $25,000 was taken by those who had indorsed the
company's paper at the bank. On August 9, 1910, plaintiff
and her husband purchased ten shares at par and gave a
check to the company for $1,000. Soon after this it was
learned by the officers that the company was in serious dif-
ficulty financially. As we understand the record, the man-
ager went away. At any rate, a new one was placed in charge
September 6, 1910. Plaintiff, having heard that something
was wrong, endeavored to find out the real situation from the
officers of the company, but was told that an expert was
going over the books and that the true condition would not
be known until the annual statement in January. At that
time (January, 1911) she was shown such statement and
copied it. This suit was then commenced to rescind the sale
and asking judgment for $1,000, with interest, and for other
equitable relief. Plaintiff has tendered back the stock and
demanded her money. The suit was brought against defend-
ant and its officers, but during the trial she dismissed as
to all but the corporation. Plaintiff's husband assigned his
stock and all his claims to plaintiff. In April, 1911, a receiver

was appointed, on the application of one of the parties who was a defendant in this case, and all the property was sold to the president of the defendant corporation. A new company was then organized by the same persons who were interested in the old company. The property was put in at $75,000 and $50,000 more was raised to pay up the debts. All claims were paid except that of the plaintiff herein.

It is alleged in the petition that the officers of the company, acting as such, for the purpose of inducing plaintiff and her husband to invest in the stock, fraudulently and wrongfully represented to them that the affairs of the company were in a prosperous condition, that dividends had been and were being earned, and that, by reason of the present condition and prospects of said company, stockholders were certain of a dividend of not less than 10 per cent.; that such statements were relied upon; that such statements so made as inducements to plaintiff and her husband to purchase said stock were false, fraudulent, and wrongful, in this, that at the time they were made and relied upon, the defendant company had sustained large and serious losses, was heavily in debt, and was running behind every day, and unable to continue business unless new capital could be interested. The answer of defendant admits the purchase of the stock; denies that the plaintiff or her husband were induced to purchase said stock by reason of any false and fraudulent representations; and states that plaintiff and her husband, with a full knowledge of all the facts and of the entire situation, invested in the stock.

There are no rights of innocent purchasers alleged, and no rights of creditors to be affected. No estoppel has been plead. Appellee does not dispute the appellants' legal propositions and has cited no authorities. The learned trial court seems to have decided the case as though it was an action at law, and found for defendant, because it was not shown that the officers of the company had knowledge that their statements and representations were not true. This is not required

in an equitable action. The reading of this record convinces us that the company had been mismanaged, and that it was insolvent at the time plaintiff purchased her stock; that such stock became worthless soon after the purchase, if, indeed, it was not so when purchased. We ought to say here that from the record before us it appears that the fault was that of the manager, and that the other officers may not have been guilty of any actual fraud or bad faith, although there are some circumstances in the record which tend to show that they were not entirely fair with plaintiff. However, we shall assume that they were. But positive statements of fact were made, by the officers acting for the company, as to the condition of the property, upon which plaintiff had the right to rely. The company was not prosperous, and no dividends had been declared, though it was otherwise represented to plaintiff. Plaintiff knew nothing of the financial condition of the company, although defendant claims a statement showing its condition was shown her in July. One of defendant's witnesses says he laid it on the table for her to see; but he does not say she read it, nor that it was read to her or her husband. Both she and her husband denied having seen it; but, if they did, it is not controlling because it was not a true statement. This written statement of July 13th shows more than $6,000 cash on hand, which the evidence shows was merchandise in transit, and it further appears from the evidence that a few days thereafter it was learned that the losses were more than $25,000 instead of $769, as shown on the statement.

We shall briefly set out plaintiff's evidence, and then detail some of the cross-examination of the officers of the company, and more particularly that of the president, upon whose representations the plaintiffs say they more especially relied. The testimony of the officers, of itself, to our minds, is very strong against them. They claim that they did not at that time know the real situation, but discovered it later.

1. FRAUD: sale of corporate stock: evidence.

Plaintiff and her husband testify that in July the man-

ager told them it was a paying business, and there was no
such thing as failure; that a large capitalist wanted control-
ling interest in the business, but was refused; that all the
men were men of means; that the president of the company
was worth over $100,000; and that the vice president was a
leader in the Presbyterian Church. This evidence is not
denied by the manager. They testify that at another time the
vice president of the company said the stock would not be on
the market long; that they would guarantee the stock and it
was the very best; that the president said:

He was president of other companies, as well as this, and
with him as president there was no such thing as fail; that
our money would be safe. Again, on August 9th, we met the
manager, president, and vice president at defendant's office.
The president said: 'Are you going to take stock this
morning?' I said, 'No, not until James comes home.' He
said: 'It will all be sold by that time; to-day is the last day
you will have an opportunity to get stock in this corporation.'
After some further arguing, Mr. Farnsworth wrote out a
check for $500, and the manager said: 'Why not let your
wife have $500? In July we declared a dividend of $700
and we will guarantee 10 if not 20 per cent. on your invest-
ment.'

As we understand the record, the witnesses claim that
this statement as to the dividend, was made by the president;
but, if this is not so, it was by the manager in his presence.
They further testify:

Then, relying upon their guaranty, Mr. Farnsworth wrote
and gave the manager a check for $1,000. The stock was
delivered to us there in the office. The president was present
until Mr. Farnsworth drew the $500 check. He said the
business was in a thriving condition and paying and there
was nothing to lose. He guaranteed the stock. He left the
office before the $1,000 check was made out. The president
signed the certificate of stock No. 33 for $500, and the vice
president the other certificate. We had no knowledge or

information in regard to the financial condition of the company except their statement that it was a thriving business and paying profits. The first information we had that anything was wrong was September 11th. We then called on the vice president and asked if he could tell us what the trouble was, and he said, 'No,' the books were being posted. He said the manager had done crooked work. The next day we called at the plant and were told the same thing. I wanted to know the nature of the loss. He said he did not know, but that the manager's bondsmen would be responsible and the stockholders would lose nothing. I did not ascertain that there was a serious loss in the business until January 14, 1911. I was away in September, and upon making inquiry upon my return in October was told that they would not know about their loss until the annual statement on January 1st. On January 14th the new manager showed me a paper.

The testimony of plaintiff and her husband is not denied by the president, except that he says he did not see her or her husband at all until after they bought the stock. But he admits signing one of the certificates of stock and is unable to explain how that happened. The president testified in reference to this: "I have no distinct recollection about the signing of the stock issued to J. R. Farnsworth; don't know where it was signed. I cannot say whether I was at the company's office on August 9, 1910, or not. I am a very busy man, meeting hundreds of people every day."

We have not set out all the testimony of plaintiff or her witnesses. They are corroborated to some extent by their son as to conversations with some of the officers. We shall now set out a part of the cross-examination of the president of the company, and, without setting out the cross-examination of the other officers, we will only state that their cross-examination is very similar to that of the president, who testified in part:

I was a member of the board of directors from the beginning; received statements from time to time showing condition of the business. I think I was present at the meeting on July

20th when it was decided to increase the capital stock. Remember Exhibit A being shown at the meeting. Q. You knew as soon as you saw this report and saw the extent of the liabilities that the company was not solvent, didn't you? A. Well, our indebtedness was higher than it should be. According to law, it was not solvent. I felt it was perfectly safe because we were guaranteeing making it safe. Q. You ascertained afterwards that report was not true, isn't that so? A. Why, we found some discrepancy in it, yes. Q. Isn't it true that the loss increased to a considerable extent because of the discovery after September 10th of liabilities that you didn't know about, that existed prior to that time? A. Yes, sir; we found some. Q. You found a large number of liabilities that you didn't know anything about when this report was made in July, didn't you? A. Yes, sir. Q. And from time to time Mr. and Mrs. Farnsworth saw you or saw somebody about the office there asking for information, didn't they? A. At times; yes, sir. Q. And you told them you wouldn't give anything definite about the matter until you got an annual statement made out, isn't that true? A. Yes, sir. Q. And when the annual statement was made and the books balanced January 14th, you found that there had been a loss of $25,611.28, didn't you? A. Whatever the figures are, I don't know the amount, but there was a loss, whichever it was, whatever the books said. Q. And then Mr. and Mrs. Farnsworth asked you to give back their money? A. Yes, sir. I told them I had nothing to give back to them. Q. As a matter of fact, when you found at your July meeting the condition the company was in, you decided to increase your capital stock and sell some new stock, didn't you? A. Yes, sir. Q. When that stock was put on the market for sale, you know now, no matter what you knew about it at the time, that the company was then absolutely insolvent? A. According to the records and books it showed it was not right. Q. And you did ascertain at some time that when these people bought this stock that the company was an insolvent corporation, didn't you? A. I didn't know it until afterwards. Q. You did afterwards ascertain that fact? That is the truth, isn't it? A. Yes, sir. Q. At the time they demanded their money back you then knew they had put their money in there when the corporation was insolvent, didn't you? A. Yes, sir. Q. And you still refuse to have the company pay it back? A. I

had no authority to pay it back. Q. If you had authority to pay it back, you would have done so? A. I don't know. Q. The truth is now that from the time in July when you found the condition of the company, from that time on, you and the other stockholders were trying in some way to raise money enough to keep the company from going into the hands of a receiver, isn't that true? A. We were raising money to keep the company going, to have it do business. Q. And with that in view, you and your fellow stockholders subscribed for considerable stock? A. Yes, sir. Q. Because you and they were on the promissory notes of the company at the bank? A. Yes, sir. I guess it is true that none of the new stock was sold to anybody but the Farnsworths. I remember of talking at one time to Mrs. Farnsworth and her son. I told them I thought the company was all right. I don't remember all that was talked about. I remember that statement made January 14, 1911. The bills payable of the company at that time were $51,351.96.

The question is so much one of fact, and being compelled to reverse the district court on the evidence, we have set out the testimony somewhat in detail. From a reading of all the evidence, it is to our minds most convincing that the representations were made substantially as alleged, and that they were relied upon, and that the statements as to the condition of the company were not as represented. Nor do we think plaintiff slept on her rights, as the trial court seems to have believed. As we have said, the legal propositions are not disputed, and we shall not discuss them at length, but content ourselves with a brief quotation from some of the cases, and cite others.

A well-established rule is that to entitle a party to relief in equity, by reason of fraudulent misrepresentations, it is not necessary that it be shown that the party making the false statements knew that they were false when he made them. They may have been innocently made, yet if a positive statement of fact is made and relied upon by the other party, to his prejudice to the extent that he is led to act thereon, equity will afford relief.

2. SAME: false statements: knowledge of falsity: relief.

*Mohler v. Carder,* 73 Iowa, 582; *Wilcox v. Iowa Wesleyan University,* 32 Iowa, 367; *Smith v. Bricker,* 86 Iowa, 285; *Hunter v. League Co.,* 96 Iowa, 573; *Weise v. Grove,* 123 Iowa, 585; *Main v. Investment Co.,* 132 Iowa, 272; *Hubbard v. Weare,* 79 Iowa, 678; *Severson v. Kock,* 159 Iowa, 343; Cook, Corporations, 145; 10 Cyc. 421.

Officers of corporations, who hold out to individuals, or to the public, advantages which will accrue to persons who take shares in their corporation, and invite them to take shares on the faith of their representations, are bound to state everything with strict accuracy. *Hubbard v. Weare,* 79 Iowa, 678; Cook, Corporations, 148. In *Main v. Investment Co., supra,* it was held that a rescission might be had, and a judgment rendered against the corporation for the amount of money paid for the stock. In her petition plaintiff asks that the judgment rendered herein be made a lien upon the property of the defendant corporation, on the theory, we suppose, that one of the officers stated that the $1,000 paid by plaintiff and her husband went into one of the buildings. This is all the evidence there is on this subject.

*3. SAME: corporations: false statements by officers.*

Plaintiff also asks that her claim be established as a preferred claim, but she was not made a party to the receivership proceedings, and no notice was served upon her; neither is the receiver made party to this action. These matters are not argued, and we think, under the circumstances, we would not be justified in going further than to hold that the contract of sale of the stock should be rescinded, and that judgment be rendered against the defendant for $1,000, with 6 per cent. interest, without prejudice to plaintiff to making her claim by appropriate action hereafter.

*4. SAME: rescission: relief.*

The cause is reversed and remanded, that a judgment and decree may be entered in accordance with the opinion, or the plaintiff may, at her election, have a decree in this court.
—*Reversed.*