Manuel GROVES and Maureen Groves, Appellants,

v.

FIRST NATIONAL BANK OF VALPARAISO, Appellee.

No. 4–385 A 73.

Court of Appeals of Indiana, Fourth District.

Feb. 4, 1988.
Rehearing Denied April 5, 1988.

R. Kent Rowe, Lewis C. Laderer, Jr., Jerry E. Huelat, Rowe & Laderer, South Bend, for appellants.

James H. Douglas and Brian J. Hurley, Douglas Douglas & Douglas, Valparaiso (Fred M. Cuppy, Thomas Burke Dyerly & Cuppy, Merrillville, of counsel), for appellee.

MILLER, Presiding Judge.

Manuel and Maureen Groves purchased a house and lot from the First National Bank of Valparaiso (the Bank). The Bank had obtained title to this property by means of a quitclaim deed from Martin E. Rogness. Rogness had encumbered the property before giving title to the Bank; although the Bank knew of these encumbrances its officers told the Groves there were no liens or mortgages on the property.

After the Groves purchased the property, the quitclaim deed from Rogness to the Bank was declared void. Rogness sued the Groves to quiet title. The Groves defended that suit, and also filed suit against the Bank for breach of contract, breach of covenant of warranty, and fraud. The trial court granted partial judgment on the evidence on the question of exemplary damages for fraud. The jury returned a general verdict in the amount of $100,000 in favor of the Groves, but the trial court ordered a new trial upon granting the motion to correct errors filed by the Bank. We reverse the order for new trial insofar as it granted a new trial with respect to liability, and we reverse the partial judgment on the evidence with respect to exemplary damages for fraud. However, because we find the jury's damage award excessive, we remand for a new trial to determine: 1) the proper amount of compensatory damages for mental anguish and; 2) whether the Groves are entitled to exemplary damages as well as the amount of such exemplary damages.

*Issues*

The Groves raise several issues for our consideration. We restate these issues as follows:

1. Did the trial court err in setting aside the jury's award of attorney's fees because the Groves did not tender the defense of their title to the Bank?

2. Did the trial court properly refuse the defendant's tendered instructions nos. 8 and 4 which dealt with attorney's fees and fraud?

3. Did the trial court err when it granted partial judgment on the evidence in favor of the Bank on the issue of punitive damage for fraud?

4. Did the trial court err in refusing plaintiffs' tendered instructions nos. 5, 9, and 10?

On cross appeal, the Bank raises the question of whether the jury awarded excessive damages for emotional distress.

### FACTS

Martin E. Rogness began construction of two houses located on lots 41 and 43 of the Fairview Meadows Unit 3 in Porter County. In order to obtain financing for this project, Rogness borrowed money from the First National Bank of Valparaiso. He executed notes in favor of the Bank which were secured by an apparently pre-existing mortgage in favor of the Bank. Rogness defaulted on the notes and the Bank initiated an action to foreclose the mortgage. The Bank also named Parks Heating & Air Conditioning (Parks), holder of a mechanics lien on the property, as a defendant in this action.

On November 12, 1981, the Bank was awarded a default judgment against Rogness. After it obtained this judgment, Rogness entered negotiations to resolve the matter without further litigation. The parties agreed Rogness would cede his interest in the two lots to the Bank in exchange for a promise that the Bank would forego any rights to pursue a deficiency against him. Pursuant to this agreement Rogness, on December 8, 1981, executed and delivered two quitclaim deeds transferring his interest in the properties to the bank.

Before Rogness executed these deeds, but after the Bank commenced the foreclosure action, Rogness executed a mortgage on the two lots in favor of Hobart Lumber Company (Hobart Lumber). This mortgage, as well as the mechanics lien in favor of Parks, was duly noted when the Bank obtained title insurance policies on the property.

On March 23, 1982, the Bank filed a petition to remove the Hobart Lumber mortgage. The petition named Hobart Lumber and Rogness as defendants; it alleged they defrauded the Bank when they executed the mortgage because they knew of the imminent transfer of the property to the Bank.

The properties were placed in the Bank's "Other Real Estate Owned", or OREO, file. This file apparently referred to properties owned by the Bank, some of which were not producing income and upon which the bank was incurring expenses. The Bank was anxious to sell these properties, since it was suffering a net loss on them.

Donald Wiggins, a loan officer of the Bank, contacted John Rhame, III, the attorney for the Bank, and asked whether the properties could be sold. Rhame advised Wiggins that the marketability of the title was impaired and that the Bank should not sell the properties on the open market. Rhame further advised Wiggins that, if the Bank insisted upon selling the properties, it should do so by setting up an escrow account, which would require disclosure of any liens and mortgages to the buyer.

Despite Rhame's advice, Wiggins proceeded to list the properties. The Bank sold lot 41 to Heriberto and Madeline Coello, but did not follow Rhame's suggestion and use an escrow account. After the Bank sold the lot 41 property, the Groves entered negotiations to purchase the lot 43 property. On August 10, 1982, these negotiations culminated in the Groves signing a purchase agreement for the lot 43 property.

Soon after the Groves signed the purchase agreement, they applied for a homeowner's loan from the Bank in order to finance the purchase of the lot 43 property. The Groves met with LeRoy Cole, one of the Bank's loan officers. Cole obtained the necessary information from the Groves, and the Bank quickly approved the loan.

After the Bank approved the loan, it ordered a title commitment policy from Pio-

neer Title Insurance Company (Pioneer). Pioneer mailed a commitment letter to Cole; he received this letter on September 5, 1982, five days before the closing on the lot 43 property. This letter noted, among other things, the existence of the Hobart Lumber mortgage, the Parks lien, and two lawsuits involving the property. When Cole read the letter, he contacted Rhame and told him that the lot 41 property had been sold. Cole also informed Rhame the Bank had prospective buyers for the lot 43 property. Rhame restated his position that the properties should only be sold through escrow and that the Bank had to disclose the existence of the encumbrances to the buyers. Shortly before closing, Mary Ann Weltz, a real estate agent who listed the lot 43 property, requested a copy of the Pioneer commitment letter. Cole did not send her a copy; instead, he assured her the Bank held clear title to the property.

On September 10, 1982, the Groves, Weltz, Cole, and Robert Bruce met in Cole's office to close the sale. Cole told the Groves a preliminary title search showed the Bank possessed merchantable title, clear of all encumbrances. When Manuel Groves asked specifically if there were any liens on the property, Cole replied there were none. When Manuel Groves asked if Hobart Lumber could make a claim against the property, Cole told him no. Groves asked these questions because he knew Hobart Lumber had already asserted a claim against the Coellos.

After the closing, the Groves borrowed $5,000 from relatives so they could complete the construction of the house. Manuel Groves worked for as many as eight hours a day for almost six weeks to complete the plumbing, duct work, and other work necessary to make the house habitable.

On October 28, the Bank recorded a corporate warranty deed granting title to the Groves. The Bank did not exempt the Parks lien or the Hobart Lumber mortgage from the coverage of the warranties in the deed. On November 5, Rhame attended a hearing in civil cause no. 81–PSC–3142, which was an action to remove the Hobart Lumber mortgage. The Groves were not informed of this hearing, even though the status of their title was, in effect, being litigated. The court, in this action, voided the quitclaim deeds which Rogness had granted the Bank.

Rhame volunteered to go to the Groves and explain what had happened, but he was dissuaded by William Welter, the Bank's chairman of the board. Welter said he would contact the Groves, but he delayed doing so for almost six weeks. When he finally contacted Maureen Groves, he merely told her there were problems with the paperwork, and asked that she and her husband come to the Bank's offices. He refused to explain the nature of these problems. The Groves decided to retain an attorney, Jerry E. Huelat, to represent them.

In response to Huelat's inquiries and threats of suit, Rhame finally explained the problems surrounding the lot 43 property. This letter, dated March 2, 1983, marked the first time any official of the Bank informed the Groves the deed from Rogness had been voided.

In yet another court proceeding on March 5, the trial court set aside the original default judgment against Rogness because the judge who granted the default, Bruce Douglas, was the son of George Douglas, a member of the Bank's board of directors. It is unclear whether the Groves were notified of this proceeding and court action.

Within days of this judgment, Rogness went to the Groves' home and informed them he was legal owner of the lot 43 property. He informed them, magnanimously, that they could rent the property from him if they desired. On April 8 Rogness filed suit against the Groves to quiet title and for damages. He also filed a request with the court that he be allowed to enter and inspect the house. The Groves thereupon filed a complaint against the Bank. After the trial court granted a partial judgment on the evidence in favor of the Bank, the jury awarded the Groves $100,000 in damages. The trial court set

aside this award when it granted the motion to correct errors filed by the Bank.

## DECISION

### I. Court's Instruction 20: Reasonable Attorney's Fees

The trial court initially instructed the jury that the Groves could recover reasonable attorney's fees, out-of-pocket expenses, and damages for mental anguish which arose out of the defense of the title to their property. These items of damages were set forth as individual paragraphs of court's instruction no. 20. The Bank objected to the instruction insofar as it referred to attorney's fees because the court did not instruct the jury the Groves had a duty to tender the defense of their title to the Bank before they could recover attorney's fees.

The Groves assert the trial court erred when it reversed its position on this instruction and granted the motion to correct errors filed by the Bank. Specifically, they argue they did not have to tender the defense of the quiet title action to the Bank because it was actively defrauding them and trying to improve its position against Hobart Lumber and Rogness at the Groves' expense.

The Bank notes the general rule requires tender of the defense to the warranting party. In this case, the Groves made no tender of the defense of the action to the Bank.

In Indiana, as in most jurisdictions which allow recovery of attorney's fees in this type of action, the party seeking recovery of fees is generally required to tender the defense to the party who breached the covenant of warranty. *Pence v. Rhonemus* (1915), 58 Ind.App. 268, 108 N.E. 129; *Teague v. Whaley* (1898), 20 Ind.App. 31, 50 N.E. 41. Neither of these cases specifically addresses the issue of whether a party who is being defrauded must tender defense to the party who is defrauding him.

We hold the Groves were not required to tender the defense of the title suit to the Bank in order to recover their attorney's fees. Although we have found no case, either in Indiana or any of our sister jurisdictions, in which a covenantee was relieved of the duty to tender defense of the title suit because of the covenantor's fraud, we have found that several of our sister states have allowed recovery without tender where tender would be futile. Specifically, tender has been found to be unnecessary where the covenantor is not present in the state at the time of the title defense. *Quick v. Walker* (1907), 125 Mo. App. 257, 102 S.W. 33; *Fulweiler v. Baugher* (1826), Pa., 15 Serg. & Rawle 45; *see* Annot., 61 A.L.R. 10. In *Fulweiler*, the Pennsylvania Supreme Court recognized, in *dicta*, that tender should not be required where the covenantor has defrauded the covenantee. 15 Serg. & Rawle at 55.

Thus, in this case of first impression, we find an exception to the general tender rule where the covenantor defrauds the covenantee. We are persuaded that to require tender would place the Groves at the mercy of the Bank, the very party which was lately defrauding them. The Bank had already demonstrated a willingness to put its interests before the Groves', and we will not require the Groves to entrust the Bank with the defense of the very interests the Bank had chosen to disregard.

Even if we had found the Groves were required to tender the defense of the title to recover attorney's fees under the covenant of warranty, we could find the jury properly awarded attorney's fees under the fee provision of the purchase agreement. The purchase agreement provided:

"In the event the sellers breach the accepted offer and fail or refuse to close, buyer shall be entitled to sue sellers either for specific performance, recission or for damages.... Any judgment recovered shall include reasonable attorney's fees, eight percent (8%) interest and shall be without relief for valuation or appraisement laws." Record, p. 1127.

The Bank argues this provision is unambiguous, and should be given its plain, ordinary meaning. *Eli Lilly and Co. v. Home Insurance Co.* (1985), Ind., 482 N.E.2d 467.

The Bank notes this provision requires both a breach of the offer and failure or refusal to close. Since instruction no. 20 does not include any mention of these requirements, the Bank argues it was erroneous.

The Groves respond, correctly, that the Bank waived this issue. When the trial court stated its intention to give instruction no. 20, the Bank objected as follows:

"Also we'd object to the court's instruction 20 which is Plaintiffs' requested 11 as modified in connection with the investigation and defense of the action filed by Martin Rogness, that action being a quiet title action.

"The Defendant believes the only basis on which they could defend this action is based on a breach of warranty contained in the warranty deed from the Defendant to the Plaintiff. The case is cited to the court, noticeably the *Teague* case." Record, p. 1118.

The Bank then went on to explain the holding in *Teague*. The entire objection to instruction no. 20 was based on failure of tender; the Bank never objected to the court's failure to instruct the jury that both a breach of the purchase agreement and failure to close had to be proved before the Groves could collect attorney's fees. As we wrote in *State v. Edgman* (1983), Ind. App., 447 N.E.2d 1091, "... it is elementary that objections to instructions not made at trial may not be raised for the first time on appeal." *Id.*, 447 N.E.2d at 1108. Failure to object specifically to an instruction precludes a party from later assigning error based upon the giving of the instruction. Ind. Rules of Procedure, Trial Rule 51(C); *Koppers Co. v. Inland Steel Co.* (1986), Ind.App., 498 N.E.2d 1247. Here, the Bank failed to raise the issue of the purchase agreement provision when it objected to instruction no. 20. The Bank was therefore precluded from raising this issue in its motion to correct errors, and the trial court erred in setting aside the jury verdict on the issue of attorney's fees.

## II. *Bank's Tendered Instructions 8 and 4*

In its ruling on the motion to correct errors, the court indicated it erred when it refused to give certain instructions tendered by the Bank. The court set aside the jury verdict because of this failure.

The Bank's tendered instruction no. 8 reads:

"In this case the defendant, pursuant to a contract to sell to the plaintiffs, conveyed the land by warranty deed to plaintiffs. When Martin Rogness asserted a right to the property against the Groves it became their duty under the law to request the defendant bank to defend against his claim. If you find that they did not do so, then they cannot recover damages from the defendant bank because of any expense in defending their property interest and possession against the claim of Martin Rogness." Record, p. 596.

The Groves argue the trial court was correct when it refused to give this instruction. They point out this instruction is inconsistent with the court's instruction no. 20, paragraph 1, which stated the Groves were entitled to out-of-pocket expenses arising from the quiet title suit. As we noted in the preceding section of this opinion, the Bank's fraud relieved the Groves of any duty to tender the defense of the title action before they could recover attorney's fees. Furthermore, the Bank failed to object to the court's instruction no. 20 insofar as it allowed for recovery of attorney's fees for breach of the purchase agreement. When the Bank failed to object, the possibility of recovery of attorney's fees under the purchase agreement became the law of the case. *First National Bank of New Castle v. Acra* (1984), Ind.App., 462 N.E.2d 1345. The Bank's tendered instruction no. 8 was not a correct statement of the law, and the trial court correctly refused to give the tendered instruction.

The trial court also based its decision to set aside the verdict on its refusal to give the Bank's tendered instruction no. 4. The court apparently reasoned the failure to give this instruction led the jury to incorrectly assess compensatory damages for emotional distress.

■ The Groves argue the court correctly refused to give this instruction because the court's other instructions adequately stated the requisite elements of proof of actual fraud. The Groves are correct.

The tendered instruction reads:

"Actual fraud is intentional deception. It is the presence or absence of the intent to deceive which distinguishes actual from constructive fraud. Actual fraud or intentional fraud involves moral turpitude and where there is neither a dishonest purpose nor recklessness, there can be no moral turpitude and hence no fraud.

"In order for you to return a verdict against the defendants bank based upon actual or intentional fraud you must find each of the following things: (1) that the bank, through its employees, made false statements of a past or existing fact as to a material matter to the plaintiffs. (2) *that the false statements were made for the purpose of deceiving and injuring the plaintiffs.* (3) that the plaintiffs were deceived. (4) that the plaintiffs were injured thereby. Unless you find all of these facts accordingly you cannot return a verdict against the defendant bank based upon actual or intentional fraud." Record, p. 592. (emphasis added).

It correctly states the principle that dishonest purpose is inherent in actual fraud. *Coffey v. Wininger* (1973), 156 Ind.App. 233, 296 N.E.2d 154. It also states dishonest purpose must be proven in order to prove actual fraud. This is true, but the instruction fails to state how dishonest purpose may be proved. A close reading of *Coffey* reveals dishonest purpose may be proved by showing the party who made the misrepresentation knew it to be false. The court wrote:

"In the case of actual fraud, the element of moral turpitude, *viz,,* knowledge of the falsity of the statement or reckless ignorance thereof, renders the purpose of the maker of such statement superfluous, *i.e.,* the fraud would not have been perpetrated were it not for the purpose of inducing action by the other party." *Id.* at 240, 296 N.E.2d at 159.

In reaching this conclusion, the court relied on an earlier decision of our supreme court, which stated:

"If the fact does not exist, and the defendant states of his own knowledge that it does, and induces another to act upon his statement, *the law will impute to him a fraudulent purpose.*" *Kirkpatrick v. Reeves* (1889), 121 Ind. 280, 282, 22 N.E. 139, 140. (emphasis added).

Thus, under our law, the Groves only needed to prove the Bank, through its agents, made false statements with the knowledge the statements were false in order to establish actionable fraud. *Tutwiler v. Snodgrass* (1981), Ind.App., 428 N.E.2d 1291, abrogated on other grounds, *Bud Wolf Chevrolet, Inc. v. Robertson* (1987), Ind. App., 508 N.E.2d 567.[1]

The trial court, in its instruction no. 14, stated, "in order to recover in an action for fraud, the plaintiffs have the burden of proving the following proposition: ... 2. That the defendants made such statements knowing them to be false, or that the defendant made the statements recklessly and without knowledge of their truth or falsity, ..." Record, p. 559. Since the law imputes dishonest purpose to one who makes a false statement which he knows to be false, this instruction adequately addresses the element of dishonest purpose. Defendant's instruction no. 4 was therefore unnecessary; indeed, it would have been redundant. The trial court committed no error when it refused defendant's instruction no. 4.[2]

---

1. Furthermore, insofar as the instruction states that, in order for the Groves to establish fraud, they were required to prove the Bank intended to injure them, it is incorrect. As Judge Neal noted in *Carrell v. Ellingwood* (1981), Ind.App., 423 N.E.2d 630, as long as an unqualified misstatement of fact is made in order to induce another to *act in reliance on the misstatement,* fraudulent intent will be implied. The law does not require that the plaintiff prove the defendant intended to harm him. Here, the record establishes the Bank misrepresented the state of the title to the property in order to induce the Groves to buy.

2. The Bank argues final instruction no. 14 allowed the jury to presume fraud. Apparently,

The trial court erred in setting aside the jury verdict because the court admitted error where none occurred. To the extent the trial court's decision setting aside the verdict is predicated on its earlier refusal to give defendant's instruction no. 4, it must be reversed.

### III.   *Exemplary Damages for Fraud*

The Groves allege the trial court erred in granting partial judgment on the evidence with regard to their claim for exemplary damages for fraud. They assert there was sufficient evidence for the jury to find the Bank defrauded them. They urge us it was improper for the trial court to remove the issue from the consideration of the jury when there was substantial evidence of a fraud perpetrated by the Bank.

The Bank challenges this argument on several grounds. It first challenges the Groves' right to raise the issue on appeal, since this issue was not one raised in the motion to correct errors filed by the Bank, and since the Groves did not themselves file a motion to correct error and raise it. The Bank next argues exemplary damages are inappropriate in the absence of compensatory damages. Finally, the Bank argues the evidence of fraud was insufficient for the trial court to allow the jury to decide the exemplary damage issue.

### A.   *Waiver*

■ The precise question of whether a party who has a jury verdict set aside when the trial court grants a motion to correct errors need file his own motion in order to raise issues not raised in his opponent's motion has not yet been decided by our courts. After studying the arguments of counsel and the purposes behind T.R. 59, we have concluded it is not necessary for a party to file a second motion in this instance.

Normally, an issue must be specifically raised in the motion to correct errors to be preserved for appeal. T.R. 59; *Krueger v. Bailey* (1980), Ind.App., 406 N.E.2d 665. The motion is a prerequisite to appellate review because it facilitates the appellate process in three ways: it allows the trial court an opportunity to correct alleged error prior to appeal, it develops the issues to be raised on appeal, and it provides the party prevailing at trial notice of which issues are to be appealed. *P–M Gas & Wash Co. v. Smith* (1978), 268 Ind. 297, 375 N.E.2d 592.

When a party is prejudiced by the granting of a motion to correct error, he need not file his own motion before he appeals the ruling on the issues *raised in the first motion. P–M Gas, supra.* Our supreme court has held that the prejudiced party may file a second motion to correct error if he so chooses, but he is not required to file one. *Breeze v. Breeze* (1981), Ind., 421 N.E.2d 647.

The Bank advances two reasons for requiring the Groves to file a motion to correct errors. It first asserts such a requirement would enable the trial court to correct its own error, in the absence of a second motion, the trial court would not be afforded this opportunity. The Bank also asserts the language of T.R. 59, as it existed at the time this appeal was filed, clearly requires the Groves to file a motion to correct errors.

At the time this appeal was filed, T.R. 59(F) read:

> *"Motion to Correct Error Granted.* A party who is prejudiced by any modification or setting aside of a final judgment or an appeal of a final order following the filing of a motion to correct error may appeal that ruling without a motion to correct error."   T.R. 59(F) (1985 ed.)

The Bank places a great emphasis on the phrase "may appeal that ruling", insisting

---

the Bank is confusing a presumption of fraud with an inference of fraudulent intent. Instruction no. 14 does allow the jury to infer fraudulent intent in certain circumstances but, as we noted earlier, *Coffey* and *Kirkpatrick* both allow such an inference. Indeed, without such an inference, it would be almost impossible to

prove actual fraud, since there would rarely, if ever, be direct evidence of fraudulent intent.

The Bank has made this argument to support several issues in its brief. We will not repeat this discussion to address each guise under which the Bank makes this argument.

that "that" refers only to rulings on those issues raised in the original motion.

The Bank contrasts the then T.R. 59(F) with T.R. 59(G). This subsection reads, in relevant part:

> "*Denial of Motion to Correct Error, and Assertion of Grounds for Relief.* If a motion to correct error is denied, the party who prevailed on that motion may, in his appellate brief and without having filed a statement in opposition to the motion to correct error in the trial court, defend against the motion to correct error on any ground and may first assert grounds entitling him to relief in the event the appellate court concludes the trial court erred in denying the motion to correct error." T.R. 59(G) (1985 ed.)

Since T.R. 59(G) specifically provided for appeal of issues not raised in the motion to correct errors, but T.R. 59(F) did not, the Bank argues the doctrine of statutory construction which states *expressio unius est exclusio alterius* compels the conclusion that the drafters of the rule intended a second motion to be filed in cases like this.

We do not agree. The Bank clearly misunderstands the intent of the drafters of T.R. 59(F). This rule was adopted to provide a procedure by which a party who has had a favorable judgment reversed or modified by the granting of a motion to correct errors a method of appealing the motion. It was not intended to limit the prejudiced party to an appeal of those issues raised in his opponent's motion to correct errors.

A party appealing under T.R. 59(F) occupies a position substantially similar to a party raising cross errors under T.R. 59(G). In either instance, the party will have prevailed at trial and, normally, will have no incentive to file a motion to correct errors until after the trial court acts on his opponent's motion. It is, of course, settled law that a party who prevails on his opponent's motion to correct errors may appeal any errors of the trial court—even those not raised in his opponent's motion—in his brief without first filing his own motion to correct errors. *McGrath v. William F. Bane Co.* (1985), Ind.App., 475 N.E.2d 1198; *May v. Blinzinger* (1984), Ind.App., 460 N.E.2d 546. We see no logical reason why a party who prevails at trial but loses on his opponent's motion to correct errors should have to file his own motion to correct errors in order to raise new allegations of error. Certainly the wording of T.R. 59(F) does not require such a result.

We do not find the differences in language between T.R. 59(G) and T.R. 59(F) to be significant. *Expressio unius est exclusio alterius*, like all doctrines of statutory construction, is merely a tool to help divine the drafter's intent. As such, we need not resort to this rule of construction when the drafter's intent is manifest. Here, the drafter's intent is clearly stated in the Supreme Court Advisory Committee's notes on T.R. 59(F).[3] The Committee commented:

> "The Committee recommends that this provision be interpreted to allow an appellant in this situation to appeal not only the granting of the motion to correct error, which would be raised on brief as set out in *P–M Gas, but the appellant should be allowed to raise those errors which occurred at trial on brief in the appellate court too.*
>
> "For example: X received a judgment as a plaintiff in an action against Y, but two rulings were made against X on the admissibility of evidence which caused X's evidence to be excluded. X properly preserved the questions at trial, by an offer to prove. Y made a motion to correct error against X's judgment, and had a judgment entered for Y, the defendant, and now appellee on that motion.
>
> "It is the Committee's recommendation that X be allowed to appeal the entry of the motion to correct error, *and raise, in addition, the two claimed errors which adversely affected X at trial, without making a motion to correct error to that effect.* In this way, that part of *P–M Gas* would be changed, and the

---

**3.** The Committee notes speak of T.R. 59(E). The trial rules have been amended, and the then T.R. 59(E) has been retitled T.R. 59(F).

limitation on issues on appeal, found in *Dehart v. Anderson,* 383 NE2d 431, 433–434 (Ind.App.1979) would be changed too." (emphasis added).

4 Harvey, *Indiana Practice,* pocket part p. 11 (1987) (emphasis added). The Committee noted it specifically rejected language which would have required the filing of an additional motion:

"To further demonstrate the intention of the Committee, the Committee considered but rejected the following language:

'If a party seeks relief on appeal from error which is claimed to have occurred prior to or in the trial court's entry of a judgment, or an appealable final order, that party must have filed a motion to correct error directed to the error which is claimed.'

"*The Committee preferred a more liberal system of raising errors on appeal, if it is the appellant who raises that error, and hence rejected the provisions set out.*" *Id.* at 12. (emphasis added).

The Committee stated it was changing the holding in *P–M Gas,* which required a second motion to correct errors if the appellant sought to raise errors not raised in his opponent's motion. The court, in *P–M Gas,* interpreted T.R. 59(G) of the rules of procedure in effect in 1979, which provided:

"(G) Motion to correct error a condition on appeal. In all cases in which a motion to correct errors is the appropriate procedure preliminary to an appeal, such motion shall separately specify as grounds therefore each error relied upon however and whenever arising up to the time of filing such motion. Issues which could be raised upon a motion to correct errors may be considered upon appeal only when included in the motion to correct errors filed with the trial court. A motion to correct errors shall not be required in the case of appeals from interlocutory orders, orders appointing or refusing to appoint a receiver, and from orders in proceedings supplemental to execution."

This rule made the motion to correct errors an absolute precondition to raising any issue on appeal. Any issue not raised in a motion to correct errors could not be considered on appeal. The language of T.R. 59(F) has no such requirement.

Finally, we note an additional motion to correct errors would be of no practical effect in this case. Even if the Groves had filed the motion and it had been granted, it would not have changed the *result* in the trial court. The Groves would still have had to appeal the issues upon which the trial court based its decision to grant a new trial. To require a second motion in these instances would be merely to set up a procedural trap for the unwary. This does not comply with the underlying philosophy of our appellate rules, which seek to facilitate, and not to frustrate, appellate review. *See P–M Gas, supra; Breeze, supra.* We therefore hold the Groves were not required to file a motion to correct errors to preserve their exemplary damages issue.

**B. *Element of Compensatory Damages.***

The Bank next argues we should uphold the trial court's decision on the motion for judgment on the evidence because, in its opinion, there was no award of compensatory damages. The Bank notes there can be no award of exemplary damages in the absence of a compensatory damage award or an award of affirmative relief of an equitable nature. *Dotlich v. Dotlich* (1985), Ind.App., 475 N.E.2d 331. It contends the sole appropriate measure of compensatory damages for fraud is the difference between the value of the property as represented and its actual value.

The Groves first argue they attempted to prove compensatory damages for the impairment of their title but were prevented from doing so because the Bank objected. They also note the trial court instructed the jury, without objection by the Bank, that the Groves could recover damages for expenses connected with the defense of the quiet title litigation, as well as damages for emotional distress. It is their position that these awards were compensatory damages sufficient to support punitive damages for fraud.

■ We need not address the Groves' first argument, because the litigation expenses and emotional distress award were items of compensatory damage which flowed from the fraud perpetrated by the Bank. In *Baker v. American States Insurance Co.* (1982), Ind.App., 428 N.E.2d 1342, the first district of our court addressed the question of whether exemplary damages for fraud could be recovered when the compensatory damage recoveries were for attorney's fees and mental anguish. After noting that compensatory damages were prerequisite to exemplary damages, the court stated:

> "On the other hand, under Issue Three we recognized the possibility that Baker could recover damages for fraud, *particularly for mental anguish resulting from the alleged misrepresentation by the adjusters for American States.*
>
> \*　\*　\*　\*　\*　\*
>
> If Baker is able to prove his claim for fraud, and the trier of fact determines that compensatory damages are in order, then the trier of fact clearly would be justified in considering an award of punitive damages as well." *Id.* at 1351. (emphasis added).

Here, the Groves claimed a recovery for emotional distress. The emotional distress recovery is an item of compensatory damage sufficient to support an award of exemplary damages, and consequently, we find no merit in the argument advanced by the Bank on this point.

### C.  *Sufficiency of the Evidence*

The Groves claim the trial court erred when it removed the issue of exemplary damages from the jury's consideration by granting judgment on the evidence pursuant to T.R. 50(A). They assert they introduced clear and convincing evidence on each element necessary for an award of exemplary damages. The Bank asserts the trial court correctly granted judgment in its favor for two reasons. First, the Bank notes compensatory damages must be proved before exemplary damages may be

awarded, and it claims the Groves failed to prove they were entitled to compensatory damages. Next, the Bank claims there was not clear and convincing evidence on every element of fraud.

■ We first address the Bank's contention that the Groves were not entitled to compensatory damages and, consequently, that they were not entitled to exemplary damages.[4] In support of this position, the Bank advances an argument which approaches circularity. Essentially, the Bank states the Groves' compensatory award was for emotional distress, and that fraud is necessary to justify damages for emotion distress absent some physical impact. The Bank claims there was no evidence of fraudulent intent, so there was insufficient evidence to support damages for fraud. Since the compensatory damages were not justified, the exemplary damages which would rest upon them are not justified.

This is another attempt by the Bank to argue that fraudulent intent cannot be inferred from the facts of the case. We rejected this argument earlier because both *Kirkpatrick, supra* and *Coffey, supra* have held that fraudulent intent may be inferred. The fact the Bank's old argument is presented in a different guise does not persuade us to change our earlier holding.

The Bank next argues there is not clear and convincing evidence of every element of fraud. We do not agree.

In reviewing a trial court decision granting a T.R. 50(A) motion, we must consider only the evidence most favorable to the non-moving party. *Jones v. Gleim* (1984), Ind., 468 N.E.2d 205; *Jones v. New York Blower Co.* (1982), Ind.App., 442 N.E.2d 382. A motion for judgment on the evidence should only be granted if there is no substantial evidence or inference to support one or more of the essential elements of the claim. *Acra, supra.* In an action for fraud, these elements are:

> "a material misrepresentation of past or existing fact, which representation is

---

**4.** It is doubtful whether the Groves suffered any damages other than emotional distress. The

Bank eventually cleared the problems with the title and conveyed good title to the Groves.

false and made with knowledge or reckless ignorance of the falsity, and which causes reliance upon such representations to the detriment of the person so relying." *Tutwiler*, 428 N.E.2d at 1295. In order to justify an award of exemplary damages, fraud must be proved by clear and convincing evidence. *Travelers Indemnity Co. v. Armstrong* (1982), Ind., 442 N.E.2d 349.

The evidence is undisputed that the Bank, through Cole, falsely misrepresented a past or existing fact—the state of the title to lot 43. The evidence is also undisputed that Cole knew he was making false statements. Furthermore, the evidence also shows, and the Bank does not dispute, that the Groves relied on the representations. Finally, the evidence shows they were harmed by their reliance in that they were faced with the threat of the loss of their home. They incurred anxiety and legal expenses before their title was made good.

The Bank also argues its conduct, and that of its agents, was no more than over-zealousness or an honest error of judgment. Again, we do not agree. Cole was informed *by an attorney* that he should inform any buyer as to the true state of title. He ignored this advice and knowingly misrepresented the state of title. Cole was not a novice; he was a loan officer with over twenty years of real estate experience. He knew the potential, and perhaps inevitable, problems to which he was exposing the Groves, yet he pushed the sale because, in his own words, "I have no particular obligation to the borrower whatsoever. My obligation is to the Bank that employs me. And my job is to create a mortgage...." Record, p. 887. Cole knew the property was a liability to his employer until it was sold. We cannot say that this evidence fails to prove fraud clearly and convincingly. It was for the jury, in the first instance, to weigh the evidence,

and the trial court erred in removing the issue from the jury's consideration.[5] We therefore remand to allow a jury to make this determination.

### IV. *Plaintiff's Instructions 5, 9, and 10*

The Groves challenge the trial court's refusal to give their tendered instructions 5, 9, and 10. Instructions 5 and 10 dealt with duties allegedly owed them by the Bank. Instruction 9 dealt with the form of a warranty deed. All three related to the issue of the Bank's liability. Because of our resolution of this appeal, we decline to comment on these instructions.

Our rules of procedure provide:

"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order in anything done or omitted by the court or by any of the parties is ground for granting relief under a motion to correct errors or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order or for reversal on appeal, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceedings which does not affect the substantial rights of the parties." T.R. 61.

In this case, we reinstate the original judgment finding the Bank liable to the Groves, and we grant the Groves a new trial on the issue of punitive damages. Consideration of the alleged errors in excluding these instructions will not affect the rights of the parties. Consequently, we need not address these alleged errors.

### V. *Excessive Damages*

■ Finally, the Bank cross appeals and challenges the trial court's refusal to find the jury's damage verdict excessive. The Bank claims the amount of damages indi-

---

**5.** The Bank asserts Cole's statements were mere mistakes of judgment because he believed the Groves would eventually get good title. However, where one knowingly makes a false statement of existing or past fact, he commits fraud even if he believes the statement will be true in

the future. *Hubbard v. Wease* (1890), 79 Iowa 678, 44 N.W. 915; *Kent Jewelry Corp. v. Kiefer* (1952), 119 N.Y.S.2d 242; *Grosh v. Ivanhoe Land Improvement Co.* (1897), 95 Va. 161, 27 S.E. 241; 37 C.J.S. *Fraud* § 24.

cates passion, partiality, or prejudice on the part of the jury.[6] It also alleges the trial court erred in refusing its tendered instruction no. 3. The Groves argue the determination of damages is a matter uniquely suited to determination by a jury, and that we should not try and search the record to determine whether the damages are excessive. They also argue the trial court correctly refused the Bank's instruction no. 3 because it does not correctly state the law.

We must confess we review the damages for emotional distress with some reluctance. We were not, after all, present to review the demeanor of the witnesses as they recounted the events which occurred here and the emotional trauma which the events induced; we are confined to review of a record which, no matter how accurate and detailed, can never convey the emotions and demeanor of the witnesses. Still, it is our duty to insure that the jury acted properly in assessing damages, and we may not shrink from this duty.

Our courts have traditionally granted the jury a great deal of discretion in assessing damage awards, *Faulk v. Chandler* (1980), Ind.App., 408 N.E.2d 584, especially when the jury is assessing damages of a kind for which the law provides no precise standards of measurement. Physical and mental pain are, by their very nature, not readily susceptible to quantification, and, therefore, the jury is given very wide latitude in determining these kinds of damages. *Chicago, South Shore & South Bend Railroad v. Brown* (1974), 162 Ind.App. 493, 320 N.E.2d 809.

The jury's discretion, while broad, is not limitless. Where the damage award is so outrageous as to indicate the jury was motivated by passion, prejudice, partiality, or the consideration of improper evidence,

we will find the award excessive. *Siebert Oxidermo, Inc. v. Shields* (1982), Ind.App., 430 N.E.2d 401, *affirmed* (1983), Ind., 446 N.E.2d 322. This standard, while easily stated, is not easily applied. Because our research has revealed no Indiana precedent which is factually similar,[7] we have looked to other jurisdictions for guidance.

At trial, the Groves testified they were frightened and angry when they learned they no longer had good title to the lot 43 property. These emotions are certainly understandable; anyone who is in danger of losing his house could be expected to experience anger and fear, especially where he spent long hours and borrowed substantial sums of money to make his house habitable. The Groves did not, however, introduce any evidence that they experienced any physical manifestations, sleeplessness, depression, or other observable indicia of emotional distress.

In *Ramsey v. American Air Filter Co.* (7th Cir.1985), 772 F.2d 1303, the court reviewed a jury award of $75,000 for mental anguish resulting from Ramsey's racially motivated dismissal. Ramsey testified that the conduct of his supervisors at American Air Filter, and his dismissal from the company, caused him to feel insulted, less than human, and "as low as any man could feel." *Id.* at 1313. Other witnesses testified that Ramsey's loss of employment preyed on his mind, and that the insults Ramsey endured made him feel disgusted and very upset. *Id.* While the court found some damages merited, it found $75,000 to be unsupported by the evidence available. The court wrote:

> "In the transcript of the five-day trial, there is a paucity of reference to any emotional harm that plaintiff suffered as a result of defendant's discrimination ...

---

6. The Bank argues the Groves introduced insufficient evidence to prove extensive attorney's fees. The Groves do not dispute this contention. The Bank suggests the fees must have been minimal, since only minimal fees can be awarded without proof. *Berkemeier v. Rushville National Bank* (1982), Ind.App., 438 N.E.2d 1054. We agree. The bulk of the verdict, then, must have been for mental anguish.

7. The Groves noted the first district upheld a compensatory damage award of $100,000 in *Acra, supra,* and urge us that *Acra* justifies the award here. We do not agree, since the $100,000 award in *Acra* was not only for mental anguish, but also for Acra's loss of his credit, damage to his reputation, and loss of property due to foreclosure. Here, aside from a *de minimis* attorney's fee award, mental anguish was the sole category of damage recovery.

In the absence of any evidence that plaintiff was treated for emotional harm or that he became depressed for any substantial period of time, however, this court finds that $75,000 is excessive compensation for the humiliation the plaintiff experienced." *Id.*

In *Moffett v. Gene B. Glick Co.* (N.D. Ind.1985), 621 F.Supp. 244, overruled on other grounds, *Reeder-Baker v. Lincoln National Corp.* (N.D.Ind.1986), 644 F.Supp. 983, the court found $50,000 not to be excessive award for mental anguish. In *Moffett,* however, the plaintiff was able to demonstrate a variety of adverse psychological and physical manifestations of the emotional distress.

In *Dykes v. Peabody Shoreline Geophysical and Transportation Co.* (1985), La. App., 482 So.2d 662, the court considered mental anguish damages awarded to a woman who was scared by seismic blasts conducted by Peabody. Because she did not introduce evidence establishing the extent of her mental anguish, the court ordered a reduction in the amount of her award.

■ We must conclude that, in the absence of evidence of any physical or psychological manifestation of mental anguish, the award of nearly $100,000 is so high as to demonstrate passion or prejudice on the part of the jury. We therefore order a new trial on the issue of damages.

Because we have found the jury's damage award excessive, we need not address the trial court's refusal of the Bank's tendered instruction no. 3.

## CONCLUSION

We find the trial court erred in setting aside the jury verdict based upon the determination that instruction no. 20 was erroneous. We therefore order the court to reinstate the verdict, and enter judgment thereupon, to the extent the verdict holds the Bank liable on the theories of fraud, breach of contract, and breach of covenant of warranty. We also order the verdict reinstated to the extent it finds the Bank liable to the Groves for the mental anguish its action caused them to experience. However, because their testimony is not sufficient to sustain the amount of mental anguish damages awarded, we order a new trial on the question of damages. Additionally, because we find the trial court erred in removing the question of exemplary damages from the jury, the exemplary damage question should also be litigated in this proceeding. We reverse the court's order in part, and affirm in part.

Reversed in part, affirmed in part, and remanded.

GARRARD, P.J., and RATLIFF, C.J., concur.